Jeremy V. Richards (CA Bar No. 102300)
PACHULSKI STANG ZIEHL & JONES LLP
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA  90067
Tel: 310/277-6910 - Facsimile: 310/201-0760
E-mail:  jrichards@pszjlaw.com


Attorneys for Falcon BP II, LLC


**UNITED STATES BANKRUPTCY COURT**
**CENTRAL DISTRICT OF CALIFORNIA**
**RIVERSIDE DIVISION**

| | |
|---|---|
| In re | Lead Case No.  6:19-bk-13127-MH |
| WOODCREST ACE HARDWARE, INC., | Jointly Administered with 6:19-bk-13130-MH; 6:19-bk-13131-MH; 6:19-bk-13132-MH; and 6:19-bk-13133-MH) |
| Debtors. | |
| | Chapter 11 |
| Affects: | **NOTICE OF MOTION AND MOTION OF FALCON BP II, LLC TO COMPEL PAYMENT OF ADMINISTRATIVE CLAIMS PURSUANT TO CONFIRMED PLAN OF REORGANIZATION AND 11 U.S.C. §§ 503(A) & (B) AND 507(A); AND FOR OTHER RELIEF; DECLARATION OF CHRIS KWASIZUR IN SUPPORT THEREOF** |
| ☐  All Debtors | |
| ☐  Woodcrest Ace Hardware, Inc., only | |
| ☐  9 Fingers, Inc., only | |
| ☑  P&P Hardware, Inc., only | |
| ☐  Riverside Ace Hardware, Inc., only | Date:    August 25, 2020 |
| ☐  Wildomar Ace Hardware, Inc., only | Time:    2:00 p.m. |
| | Place:    Ctrm. 303 |
| | 3420 12th St |
| | Riverside, CA 92501-3819 |

**TO THE HONORABLE MARK HOULE, UNITED STATES BANKRPUTCY JUDGE; ALL PARTIES RECEIVING CM/ECF NOTICE; THE OFFICE OF THE UNITED STATES TRUSTEE; AND ALL PARTIES REQUESTING SPECIAL NOTICE:**

1

**PLEASE TAKE NOTICE** that Falcon BP II, LLC ("*Falcon*") hereby moves (the "*Motion*") the Court for entry of an order pursuant to 11 U.S.C. §§ 503(A) & (B) and 507(A) to compel payment of their administrative claims pursuant to the confirmed plan of reorganization.

**PLEASE TAKE FURTHER NOTICE** that a hearing on the Motion has been scheduled for August 25, 2020 at 2:00 p.m., Pacific Time, or as soon thereafter as counsel may be heard, before the Honorable Mark Houle, United States Bankruptcy Court Judge, in Courtroom 303, 3420 Twelfth Street, Riverside, CA 92501-3819.

**PLEASE TAKE FURTHER NOTICE** that the Motion is based upon this Notice of Motion and Motion, and the legal arguments contained therein, the Declaration of Chris Kwasizur (the "*Kwasizur Declaration*") filed concurrently herewith, and the record in these chapter 11 cases (the "*Cases*"), together with any further evidence as may be presented to the Court at the hearing on the Motion.

**PLEASE TAKE FURTHER NOTICE** that, pursuant to Local Bankruptcy Rule 9013-1(f), if you wish to oppose the Motion, you must file a written response with the Court and serve a copy of it upon the undersigned counsel no later than fourteen (14) days prior to the hearing on the Motion. The failure to properly file and serve an opposition may be deemed consent to the relief requested in the Motion or a waiver of any right to oppose the Motion.

**WHEREFORE**, Falcon respectfully requests that the Court: (a) grant the Motion; (b) issue an order compelling Debtor to pay Falcon the sum of $38,550.52 (representing rent owed by the Debtor through the Effective Date of its confirmed plan of reorganization); and (c) grant such other and further relief as is just and proper under the circumstances.

Dated:  August 4, 2020                              PACHULKSI STANG ZIEHL & JONES LLP


By:    */s/ Jeremy V. Richards*
       Jeremy V. Richards
       Attorneys for Falcon BP II, LLC

DOCS_LA:331119.1 68700/001                                                         0002

Falcon BP II, LLC ("***Falcon***") hereby moves for an order compelling payment of an administrative claim by P&P Hardware, Inc. (the "***Debtor***") pursuant to Debtor's confirmed plan of reorganization and Bankruptcy Code §§503 (a) and (b); and 507(a), and granting such other relief as is just and proper.

## I.

### Relevant Facts

1.      On October 25, 2013, Falcon and Debtor entered in to a lease agreement (the "***Lease***"), pursuant to which Debtor leased from Falcon certain property commonly known as 14529 Innovation Drive, Suite B, Riverside, CA 92518 (the "***Premises***").

2.      By order entered June 2, 2020, the Court confirmed Debtor's First Amended Plan of Reorganization (the "***Plan***"), Docket # 237.  Falcon is informed and believes that the Effective Date of the Plan was July 17, 2020.

3.      Article IV.A.1 of the Plan requires the Debtor to pay all administrative expense claims in cash on the Effective Date, unless the holder of such claim agrees otherwise.

4.      As required by the Plan, Debtor timely filed a Request for Payment of Administrative Expense Claim on July 2, 2020 (Claim # 16-1), requesting payment of rent for the months of April through June of 2020, plus additional accruals. Debtor has acknowledged that these, plus additional accruals, are owing to Falcon.

5.      Although Debtor purported to reject the Lease pursuant to the Plan as of the Confirmation Date, it remains in possession of the Premises and rent continues to accrue.

6.      As more fully set forth in the Kwasizur Declaration, Debtor currently owed Falcon the sum of $38,550.52, as of the Effective Date.

7.      Debtor has not agreed to payment of its administrative claim expense other than in accordance with the Plan.

## II.

### Legal Argument

1.      The Debtor's case remains open, and, pursuant to the Plan, jurisdiction was retained by this Court to enforce the Plan (Plan, Art. IX. G).  All courts possess inherent and ancillary subject

1

matter jurisdiction to enforce their own orders. *Local Loan Co. v. Hunt*, 292 U.S. 234, 239 (1934). This ancillary jurisdiction exists "irrespective of whether the court would have jurisdiction if the proceeding were an original one." *Id. See also In re Chateaugay Corp.*, 201 B.R. 48, 62 (S.D.N.Y. 1996) ("Bankruptcy courts have inherent or ancillary jurisdiction to interpret and enforce their own orders wholly independent of the statutory grant of jurisdiction conferred under 28 U.S.C. § 1334.").

2.      The Plan required all administrative expense claims to be paid in full, in cash, on the Effective Date.

3.      Falcon asserts the Claim as an administrative claim under 11 U.S.C. § 503(b) as "actual, necessary costs and expenses of preserving the estate."  Falcon is informed and believes that Debtor does not dispute either the amount of the claim or that it is entitled to administrative expense priority pursuant to 11 USC §§ 503(a); 503(b); and 507(a).

4.      Debtor purported to reject the Lease pursuant to the Plan as of the Confirmation Date but remained and remains in possession of the Premises.

### III.

### CONCLUSION

Wherefore, Falcon seeks an order compelling Debtor to pay Falcon the sum of $38,550.52 as an administrative claim pursuant to the Plan, and that it grant such other relief as is just and proper.

Dated:  August 4, 2020                   PACHULKSI STANG ZIEHL & JONES LLP


By:     /s/ *Jeremy V. Richards*
        Jeremy V. Richards
        Attorneys for Falcon  BP II LLC

# DECLARATION OF CHRIS KWASIZUR

I, Chris Kwasizur, do hereby declare as follows:

1.      I am the President of Falcon BP II, LLC.  I make this Declaration based on facts within my personal knowledge.  If called upon, I can and will competently testify to the facts stated herein.

2.      I make this Declaration in support of the Motion of Falcon BP II, LLC to Compel Payment of Administrative Claims Pursuant to Confirmed Plan of Reorganization and 11 U.S.C. §§ 503(A) & (B) AND 507(A) (the "*Motion*").  Capitalized terms not otherwise defined herein have the same meaning ascribed to them in the Motion.

3.      Attached hereto as Exhibit "A" is a true and correct copy of the Lease between Falcon and the Debtor, relating to the Premises.

4.      The Debtor remains in possession of the Premises. As of the Effective Date of the Plan, the Debtor owed Falcon BP II LLC $38,550.52 under the Lease and for occupancy of the Premises, all as more fully detailed in Exhibit "B" attached hereto.

I declare under penalty of perjury that the foregoing is true and correct and this declaration was executed this 4th day of August, 2020 at Newport Beach, California.

_____
CHRIS KWASIZUR

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

# EXHIBIT A

1

**LEASE**

LANDLORD

Falcon Business Park LLC,
a California limited liability company

TENANT

P&P Hardware, Inc.
a California corporation

ORIGINAL

# TABLE OF CONTENTS

1. Premises .................................................................................................................................... 6

2. Term .......................................................................................................................................... 6

3. Rent; Additional Charges ........................................................................................................ 7

4. Additional Charges for Taxes and Common Expenses ........................................................ 7

5. Construction of Landlord Improvements .............................................................................. 9

6. Conduct of Business by Tenant ............................................................................................ 10

7. Alterations and Tenant's Property ....................................................................................... 10

8. Landlord's Repairs ................................................................................................................ 11

9. Tenant's Repairs .................................................................................................................... 11

10. Abandonment ........................................................................................................................ 12

11. Liens ....................................................................................................................................... 12

12. Assignment and Subletting ................................................................................................... 12

13. Compliance with Laws .......................................................................................................... 13

14. Subordination ........................................................................................................................ 14

15. Inability to Perform .............................................................................................................. 14

16. Damage or Destruction ......................................................................................................... 14

17. Eminent Domain .................................................................................................................... 15

18. Utilities ................................................................................................................................... 16

19. Default .................................................................................................................................... 16

20. Insolvency or Bankruptcy ..................................................................................................... 17

21. Landlord's Performance of Tenant's Obligations ............................................................... 17

22. Indemnification ...................................................................................................................... 17

23. Insurance ................................................................................................................................ 18

24. Access to Premises ................................................................................................................. 19

25. Notices .................................................................................................................................... 19

26. No Waiver by Landlord ......................................................................................................... 19

27. Tenant's Certificates ............................................................................................................. 19

28. Tax on Tenant's Personal Property ...................................................................................... 20

29. Security Deposit ..................................................................................................................... 20

30. Authority ................................................................................................................................ 20

31. Broker ..................................................................................................................................... 20

32. Miscellaneous ......................................................................................................................... 20

0008

## LIST OF EXHIBITS

EXHIBIT "A"    Legal Description

EXHIBIT "B-1"    Map of Center

EXHIBIT "B-2"    Premises Floor Plan

EXHIBIT "C"    Landlord Improvements / Tenant Improvements

EXHIBIT "D"    Rules and Regulations

EXHIBIT "D-1"    Parking Exhibit

EXHIBIT "E"    Sign Criteria

EXHIBIT "E-1"    Falcon Business Park, Planned Sign Program, dated December 22, 2005

EXHIBIT "F"    Industrial Waste Survey

ADDENDUM

## BASIC LEASE INFORMATION

| | | |
|---|---|---|
| 1. | **Lease Date:** | October 25, 2013 |
| 2. | **Landlord:** | FALCON BUSINESS PARK LLC<br>a California limited liability |
| 3. | **Landlord's Address:** | 4 Upper Newport Plaza, Suite 100, Newport Beach, CA 92660<br>(949) 833-5400 Telephone, (949) 833-5401 Facsimile |
| 4. | **Tenant:** | P&P Hardware, Inc.<br>a California corporation<br>Corporate Entity No. C3189342<br>Doing business as: P&P Uniforms |
| 5. | **Tenant's Address:** | 30733 Temecula Parkway<br>Temecula, CA 92592<br>Facsimile: _____ |
| | With a copy to: | _____<br>_____<br>_____<br>Facsimile: _____ |
| 6. | **Tenant's Contact:** | _____<br>Telephone: _____<br>Facsimile: _____ |
| 7. | **Building:**<br>(Par. 1.1) | A concrete tilt-up industrial building commonly known as 14529 Innovation Drive, Riverside, CA 92518, as depicted as Building G on the site plan attached hereto as Exhibit "B-1". |
| 8. | **Premises:** | A portion of the Building comprising approximately 13,289 square feet, and commonly known as 14529 Innovation Drive, Suite B Riverside, CA 92518. |
| 9. | **Parking:**<br>(Par. 1.3) | 27 unassigned, non-exclusive spaces. |
| 10. | **Rentable Area of Premises:**<br>(Par. 1.4) | Approximately 13,289 square feet (includes tenant's % share of electrical room). |
| 11. | **Term:**<br>(Par 2.1) | Sixty (60) Months<br>**Commencement Date:** January 1, 2014<br>**Expiration Date:** December 31, 2018 |
| 12. | **Option to Extend;**<br>**Option Rent:**<br>(Par 2.4) | One (1) Sixty (60) month option to extend at the then fair market value, but no less than the rent for the immediately preceding twelve month period.  Option Rent to increase base on CPI index, per Addendum. |

13. **Monthly Rent**
    (Par. 3.)

| Month | Monthly Rental |
|---|---|
| 1-12: | $5,648 |
| 13-24: | $5,817 |
| 25-36: | $5,992 |
| 37-48: | $6,172 |
| 49-60: | $6,357 |

| | | |
|---|---|---|
| 14. | **Tenant's Share**<br>(Par. 4.1.2) | (See Paragraph 4.1.2). |
| 15. | **Use:**<br>(Par. 6.1) | Warehouse, distribution, light apparel manufacturing, incidental  retail of law enforcement uniforms and tactical gear. |

4

16. **Alterations Limit**:    Two thousand dollars ($2,000)
    (Par. 7.1)

17. **Security Deposit**:    $6,500
    (Par. 29)

18. **Brokers**:    Spencer Hull, Coldwell Banker Lazar & Associates
    (Par. 31)

The foregoing Basic Lease Information is hereby incorporated into and made a part of the Lease of the same date to which it is attached.  Each reference in this Lease to any of the Basic Lease Information shall mean the respective information herein above set forth and shall be construed to incorporate all of the terms provided under the particular Lease section pertaining to such information.  In the event of any conflict between any Basic Lease Information and the Lease, the latter shall control.

**LANDLORD**                          **TENANT**

FALCON BUSINESS PARK LLC              P&P HARDWARE, INC.
a California limited liability company  a California Corporation
    By:  Falcon BP II LLC
    It:    Sole Member
    By:                               By:
        Donald E. Russell                 Paul Douglas Shambarger
    Its:    Managing Member          Its:    CEO

0011

## INDUSTRIAL-SERVICE CENTER LEASE

THIS LEASE is dated for reference purposes only as of the date set forth in the Basic Lease Information and is entered into by and between **FALCON BUSINESS PARK LLC**, a California limited liability company ("Landlord"), and **P&P HARDWARE, INC.**, a California Corporation ("Tenant").

In consideration of the mutual covenants and agreements set forth herein, Landlord and Tenant agree as follows:

1.    **Premises.**

1.1    Upon and subject to the terms, covenants and conditions hereinafter set forth, Landlord hereby leases to Tenant and Tenant hereby hires from Landlord those premises ("Premises") described in Paragraph 8 of the Basic Lease Information, in the building ("Building") specified in Paragraph 7 of the Basic Lease Information located in the business park ("Center") commonly known as Falcon Business Park, in the County of Riverside, State of California, and more particularly described in **Exhibit "A"** attached hereto and depicted on **Exhibit "B-1"** attached hereto. The Premises comprises a portion of the Building substantially as shown by cross-hatching on **Exhibit "B-1"** attached hereto. A floor plan of the Premises is attached hereto as **Exhibit "B-2"**.

1.2    Tenant shall have the right, for the benefit of Tenant and its employees, suppliers, shippers, customers and invitees, to the non-exclusive use of all areas and facilities outside the Premises and within the exterior boundary line of the Center that are provided and designated by Landlord from time to time for the general non-exclusive use of Landlord, Tenant and the other tenants of the Center and their respective employees, suppliers, shippers, customers and invitees, including parking areas, loading and unloading areas, drives, walkways, roadways, trash areas and landscaped areas ("Common Areas"), subject to all rules and regulations promulgated time to time by Landlord.

1.3    Tenant shall have the right, for the benefit of Tenant and its employees, customers and invitees, to the non-exclusive use of the number of vehicle parking spaces as specified in the Basic Lease Information on those portions of the Common Areas designated for parking by Landlord from time to time. Such parking spaces shall be used by all tenants of the Center on an unassigned basis.

1.4.    The rentable area of the Premises shall mean that amount specified in the Basic Lease Information.

1.5    Civil Code Section 1938 Disclosure. As of the date of this Lease, neither the Premises nor the Common Areas have been inspected by a Certified Access Specialist.

2.    **Term.**

2.1    The Premises are leased for a term ("Term") to commence ("Commencement Date") and expire ("Expiration Date") on, as specified in Paragraph 11 the Basic Lease Information, unless the Term shall sooner terminate as hereinafter provided. If, on or prior to the date set forth in the Basic Lease Information for the commencement of the Term, Landlord fails to deliver possession of the Premises, either (a) because the Tenant Improvements (as hereinafter defined in Paragraph 5.1) shall not have been substantially completed, or (b) because a previous occupant is holding over, or (c) because of any other cause or reason beyond the reasonable control of Landlord, the following provisions shall apply: (i) the Commencement Date shall be deferred to a date fixed by Landlord in a notice to Tenant, which notice shall state that the Premises are, or prior to the commencement date fixed in such notice will be, substantially completed and ready for occupancy by Tenant; provided, however, that Landlord may from time to time, by notice to Tenant, further change the commencement date fixed in a prior notice; (ii) neither the validity of this Lease nor the obligations of Tenant under this Lease shall be affected by such failure to deliver possession, except that the Term shall begin as provided in clause (i) above; (iii) Tenant shall have no claim against Landlord because of Landlord's failure to deliver possession of the Premises on the date originally fixed thereof; and (iv) the expiration date shall be adjusted accordingly in the event the commencement date is extended beyond the date specified in the Basic Lease Information.

2.2    The dates upon which the Term shall commence and terminate pursuant to this Paragraph 2 are herein called the "Commencement Date" and the "Expiration Date," respectively.

2.3    Notwithstanding anything contained herein to the contrary, in the event the Term shall not have commenced on or before the date which is ninety (90) days after the date set forth in Paragraph 1 of the Basic Lease Information, then this Lease shall automatically terminate without any further act of either party hereto and both parties hereto shall be released from all obligations hereunder.

2.4    Tenant shall have the option to extend the Term of this Lease, as specified in Paragraph 12 of the Basic Lease Information ("Extended Term"), provided that both at the time of exercise of the option and at the commencement of the Extended Term to which such options relates, (a) Tenant is not in Default (as hereinafter defined) under this Lease, and (b) the Premises are occupied by the original Tenant. By Tenant's exercise of any such option, Tenant shall be deemed to have acknowledged and confirmed that all of the terms and conditions set forth in this Lease are in effect, and shall remain the same, except that the "Monthly Rent," as defined in Paragraph 3 of this Lease, commencing as of the date on which such Extended Term commences, shall be the Monthly Rent set forth in Paragraph 12 of the Basic Lease Information with reference to such Extended Term (but in no event shall it be less than the

6

Monthly Rent of the preceeding month).  Any such option may only be exercised by written notice of exercise from Tenant received by Landlord on or before the date which is 6 months, but in no event greater than 9 months, prior to the expiration of the then existing Term.

If Paragraph 12 of the Basic Lease Information provides that the Monthly Rent for the Extended Term is fair market rental value ("Market Rent"), then Market Rent shall be determined by written agreement of the parties at least 30 days prior to, but in no event more than 60 days in advance of, the commencement of the Extended Term. If they agree on Market Rent by such date, they shall immediately execute an amendment to this Lease stating the new Monthly Rent is the agreed Market Rent.

If the parties are unable to agree on Market Rent by such date, then, within ten days after such date, each party, at its cost and by giving notice to the other party, shall appoint a M.A.I. real estate appraiser with at least five years full-time commercial appraisal experience in the area in which the Premises are located to determine Market Rent. If a party does not appoint an appraiser within ten days after the other party has given notice of the name of its appraiser, the single appraiser appointed shall be the sole appraiser and shall determine Market Rent. If the two appraisers are appointed by the parties as stated in this section, they shall meet promptly and attempt to agree on Market Rent. If they are unable to agree within 15 days after the second appraiser has been appointed, they shall attempt to elect a third appraiser meeting the qualifications stated in this paragraph within ten days after the last day the two appraisers are given to determine Market Rent. If they are unable to agree on the third appraiser, either of the parties to this Lease by giving ten days notice to the other party may file a petition with the American Arbitration Association solely for the purpose of selecting a third appraiser who meets the qualifications stated in this paragraph. Each party shall bear half the cost of the American Arbitration Association appointing the third appraiser and of paying the third appraiser's fee. The third appraiser, however selected, shall be a person who has not previously acted in any capacity for either party.

Within 30 days after the selection of the third appraiser, a majority of the appraisers shall determine Market Rent.  If a majority of the appraisers is unable to agree upon Market Rent within such period, the three appraisals shall be added together and their total divided by three; the resulting quotient shall be Market Rent for purposes of this Paragraph, unless any appraisal is more than ten percent lower (or higher) than the middle appraisal, in which case the appraisal which is more than ten percent lower (or higher) than the middle appraisal shall be disregarded. If only one appraisal is disregarded, the remaining two appraisals shall be added together and their total divided by two; the resulting quotient shall be Market Rent for purposes of this Paragraph. If both the low appraisal and the high appraisal are disregarded, the middle appraisal shall be Market Rent for purposes of this Paragraph.

After Market Rent for the applicable optional renewal term has been determined, the appraisers shall immediately notify the parties and they shall immediately execute an amendment to this Lease stating the new Monthly Rent is the agreed Market Rent.

3.    **Rent; Additional Charges**.

3.1    Tenant shall pay to Landlord in lawful money of the United States during the Term the monthly rental specified in the Basic Lease Information ("Monthly Rent"), which sum shall be payable by Tenant on or before the first day of each calendar month, in advance, at the address specified for Landlord in the Basic Lease Information or such other place as Landlord shall designate, without any prior demand thereof and without any abatement, deduction, claim or set-off whatsoever.  The term "Rent" shall mean Monthly Rent plus the Additional Charges as hereinafter defined.

3.2    Upon execution and delivery to Landlord of this Lease, Tenant shall deliver to Landlord the sum set forth in Paragraph 11 of the Basic Lease Information as Monthly Rent paid in advance for the first calendar month of the Term, together with such additional amount as is required to prepay rent for any partial month pursuant to Paragraph 3.5.  Such prepaid Monthly Rent shall be applied as payment of Monthly Rent for the first calendar month and any partial month after the Commencement Date in which Monthly Rent is payable under this Lease.

3.3    Tenant shall pay to Landlord all charges and other amounts whatsoever as provided in this Lease ("Additional Charges") including, without limitation, any charge or increase resulting from the provisions of Paragraph 4 below.  All such amounts and charges shall be payable to Landlord at the place where the Monthly Rent is payable.  Landlord shall have the same remedies for a Default in the payment of Additional Charges as for a Default in the payment of Monthly Rent.

3.4    If Tenant shall fail to pay Rent within Five (5) days after the  date the  same is due and payable, such unpaid amounts shall be subject to a late payment charge equal to five (5%) percent  of such unpaid amounts in each instance to cover Landlord's additional administrative costs resulting from Tenant's failure to pay.  If Tenant shall fail to pay any other charge due within Five (5) days after the notice from Landlord stating the same is due and payable, such unpaid amounts shall be subject to a later payment charge equal to five (5%) percent of such unpaid amounts in each instance to cover Landlord's additional administrative costs resulting from Tenant's failure to pay. Any such late payment charges have been agreed upon by Landlord and Tenant after negotiation as a reasonable estimate of the additional administrative costs and detriment to Landlord's ability to meet its own obligations relating to the Building in a timely manner that will be incurred by Landlord as a result of any such failure by Tenant, the actual cost thereof in each instance being extremely difficult, if not impossible, to determine.  Such late payment charge shall constitute liquidated damages to compensate Landlord for its damages resulting from such

7

failure to pay and shall be paid to Landlord together with such unpaid amounts. Acceptance of any late charge shall not constitute a waiver by Landlord of Tenant's Default with respect to the overdue amount, and shall not prevent Landlord from exercising any of the other rights and remedies available to Landlord for any other breach by Tenant under this Lease. Notwithstanding the foregoing, upon the second occurrence during any consecutive twelve (12) month period during the Term of this Lease of Tenant's failure to pay Monthly Rent or Additional Charges when due, Landlord may condition continuation of this Lease upon a requirement that Tenant concurrently execute an amendment to this Lease which provides that Monthly Rent for the balance of the term of this Lease shall be made in quarterly installments, in advance, in an amount equal to the sum of the Monthly Rent amounts payable during such three month period.

3.5  If the Commencement Date should occur on a day other than the first day of a calendar month, or if the Expiration Date occurs on a day other than the last day of a calendar month, then the Monthly Rent for such fractional month shall be prorated on a daily basis based upon a 30-day calendar month.

4.  ~~**Additional Charges for Taxes and Common Expenses.**~~

~~4.1  For purposes of this Paragraph 4, the following terms shall have the meanings hereinafter set forth:~~

~~4.1.1  "Computation Year" shall mean each 12 consecutive month period commencing January 1 of each year during the Term, provided that Landlord, upon notice to Tenant, may change the Computation Year from time to time to any other 12 consecutive month period and, in the event of any such change, Tenant's Share of excess Taxes, as hereinafter defined, shall be equitably adjusted for the Computation Years involved in any such change.~~

~~4.1.2  "Tenant's Share" shall mean: (i) for Common Expenses other than Regular Assessments levied under the Project CC&Rs (as defined in Paragraph 6.6 below), the percentage equal to the quotient derived by dividing the rentable square footage of the Premises by the total rentable square footage (exclusive of mezzanine area) of the buildings in the Center which Landlord determines are served by the Common Areas for which the Common Expenses have been incurred; and (ii) to the extent the Common Expenses consist of Regular Assessments levied under the Project CC&Rs, (A) if the Premises consists of less than the entire Building, the percentage equal to the quotient derived by dividing the rentable square footage of the Premises by the total square footage of the Building (exclusive of mezzanine area), or (B) if the Premises consists of the entire Building, 100%.~~

~~4.1.3  "Taxes" shall mean all taxes, assessments and charges levied upon or with respect to the Center or any personal property of Landlord used in the operation thereof or Landlord's interest in the Center or such personal property. Taxes shall include, without limitation, all general real property taxes and general and special assessments, charges, fees or assessments for transit, housing, police, fire or other governmental services or purported benefits to the Center, service payments in lieu of taxes, and any tax, fee or excise on the act of entering into this Lease or any other lease of space in the Center during the Term of the Lease, or on the use or occupancy of the Center or any part thereof, or on the rent payable under any lease or in connection with the business of renting space in the Center that are now or hereafter levied or assessed against Landlord by the United States of America, the State of California, or any political subdivision, public corporation, district or other political or public entity during the Term of the Lease, and shall also include any other tax, fee or other excise, however described, that may be levied or assessed as a substitute for or as an addition to, as a whole or in part, any other Taxes, whether or not now customary or in the contemplation of the parties on the date of this Lease. Taxes shall not include franchise, transfer, inheritance or capital stock taxes or income taxes measured by the net income of Landlord from all sources unless, due to a change in the method of taxation, any of such taxes is levied or assessed against Landlord as a substitute for or as an addition to, as a whole or in part, any other tax that would otherwise constitute a Tax. Taxes shall also include reasonable legal fees, costs and disbursements incurred in connection with proceedings to contest, determine or reduce Taxes.~~

~~4.1.4  "Common Expenses" shall mean: (i) to the extent not included within Regular Assessments levied under the Project CC&Rs, the aggregate amount of all costs and expenses paid or incurred by Landlord in connection with the operation, repair and maintenance of the Common Areas, which costs shall include, without limitation, landscaping services, sweeping, maintenance services, repairs to and replacement of asphalt paving, bumpers, striping, light bulbs, light standards, guard and directional signs and lighting systems, exterior Building lighting, fences, gates, perimeter walls, retaining walls, sidewalks, planters, storm drains, landscaping and sprinkler system in planting area, life safety systems, including without limitation, sprinkler systems; any and all assessments levied against the Center pursuant to any recorded covenants, conditions and restrictions; removal of trash, rubbish and other refuse from the Center, cleaning of and replacement of signs of the Center, including relamping and repairs made as required; maintenance of tenant directories; payment of all gas, electrical, water and other utility charges or fees for services furnished to the Common Areas; obtaining and maintaining public liability, property damage and other forms of insurance which Landlord may or is required to maintain; establishment of reasonable reserves for replacements and/or repair of Common Area improvements, equipment and supplies; employment of such personnel as may be deemed reasonably necessary, if any, to direct parking and police the Common Area and facilities; depreciation of machinery and equipment used in connection with the maintenance and operation of the Common Area, depreciation of Common Area improvements to~~

8

0014

~~cover the costs of replacement and reconstruction thereof from time to time as needed; employment of personnel directly used in connection with the operation, maintenance and repair of the Center including payment or provision for unemployment insurance, workers' compensation insurance and other employee costs; overhead and administrative expenses and a management fee; the cost of bookkeeping, accounting and legal services provided in connection with the operation and maintenance of the Center; any other items reasonably necessary from time to time to properly repair, replace, maintain and operate the Common Area within the Center and any interest paid in connection therewith; and (ii) the Regular Assessments levied under the Project CC&Rs against the separate legal parcel upon which the Building is located. Notwithstanding the foregoing, if Landlord elects to delegate its duties hereunder to a professional property manager, then Landlord shall not be entitled to receive any management fee (except for any costs and/or administrative and overhead expenses reasonably incurred by Landlord in "monitoring" and "auditing" the performance delegated to the professional property manager as contemplated herein which costs and/or expenses shall be reimbursed to Landlord as incurred and billed) but under such circumstances any reasonable amount paid to the professional property manager shall be added to and deemed a part of the Common Expenses. Notwithstanding the foregoing, Common Expenses shall not include the following: (i) depreciation of the Building; (ii) costs of repairs or other work occasioned by fire, earthquake, flood, windstorm or other casualty (other than those amounts within the deductible limits of insurance policies actually carried by Landlord, which amounts shall be includable as Common Expenses so long as such deductibles do not exceed an aggregate total of $100,000 for any calendar year); (iii) costs of leasing commissions, attorneys' fees, advertising and marketing costs, space planning fees and other costs and expenses incurred in connection with negotiations with prospective tenants of the Center; (iv) costs (including permit, license and inspection costs) incurred in renovating or otherwise improving, decorating or redecorating rentable space for other tenants or other occupants or vacant rentable space; (v) costs for which Landlord is entitled to and actually receives reimbursement (other than through any operating cost reimbursement provision identical or substantially similar to the provisions set forth in this Lease); (vi) costs of leasehold improvements for other tenants of the Building or the Center; (vii) costs incurred to comply with laws relating to the monitoring, testing, reporting, management, removal, encapsulation or other form of remediation of asbestos and other "Hazardous Materials" (as defined below), which was in existence in the Center prior to the Commencement Date, and was of such a nature that a federal, state or municipal governmental authority, if it had then had knowledge of the presence of such Hazardous Materials, in the state, and under the conditions that it then existed in the Center would have then required the monitoring, testing, reporting, management, removal, encapsulation or other form of remediation of such Hazardous Materials or other remedial or containment action with respect thereto; (viii) costs incurred due to disputes between Landlord and Tenant or any other tenant or occupant of the Building or the Center (including any costs or fees paid by Landlord to a third party in connection with any such dispute), except to the extent that the benefit derived by Landlord's pursuit or defense of such dispute or payment of such costs or fees is or would be a benefit to the Building or the Center as a whole; or (ix) capital improvements made to the Building or the Center by Landlord which are required under any governmental law or regulation applicable to the Building or the Center as of the Commencement Date. The computation of Common Expenses shall be made in accordance with generally accepted accounting principles. Common Expenses shall be adjusted to reflect a 95% occupancy of the Center during any period in which the Center is not at least 95% occupied.~~

~~4.2   Tenant shall pay to Landlord as Additional Charges 1/12th of Tenant's Share of the Taxes for each Computation Year, on or before the first day of each month during such Computation Year, in advance, in an amount estimated by Landlord and billed by Landlord to Tenant; provided that Landlord shall have the right initially to determine monthly estimates and to revise such estimates from time to time. With reasonable promptness after Landlord has received the tax bills for any Computation Year, Landlord shall furnish Tenant with a statement (herein called "Landlord's Tax Statement") setting forth the amount of Taxes for such Computation Year and Tenant's Share of such Taxes.  If the actual Taxes for such Computation Year exceed the estimated Taxes paid by Tenant for such Computation Year, Tenant shall pay to Landlord the difference between the amount paid by Tenant and the actual Taxes within thirty (30) days after the receipt of Landlord's Tax Statement and, if the total amount paid by Tenant for any such Computation Year shall exceed the actual Taxes for such Computation Year, such excess shall be credited against the next installments of Taxes due from Tenant to Landlord hereunder.~~

~~4.3   Tenant shall pay to Landlord as Additional Charges 1/12th of Tenant's Share of the Common Expenses for each Computation Year, on or before the first day of each month of such Computation Year, in advance in an amount estimated by Landlord and billed by Landlord to Tenant; provided that Landlord shall have the right initially to determine monthly estimates and to revise such estimates from time to time. With reasonable promptness after the expiration of each Computation Year, Landlord shall furnish Tenant with a statement (herein called "Landlord's Expense Statement") setting forth in reasonable detail the Common Expenses for such Computation Year and Tenant's Share of such Common Expenses.  If the actual Common Expenses for such Computation Year exceed the estimated Common Expenses paid by Tenant for such Computation Year, Tenant shall pay to Landlord the difference between the amount paid by Tenant and the actual Common Expenses within thirty (30) days after the receipt of Landlord's Expense Statement and, if the total amount paid by Tenant for any such Computation Year shall exceed the actual Common Expenses for such Computation Year, such excess shall be credited against the next installments of the estimated Common Expenses due from Tenant to Landlord hereunder. At any reasonable time within twelve (12) months after Landlord's delivery of an actual statement of Tenant's Share of Common Expenses, and upon five (5) business days' notice to Landlord, Tenant may cause an audit to be made of Landlord's records related to charges for the actual statement of Tenant's Share of Common Expenses for the period covered by the aforementioned statement.  The costs of such audit shall be borne by Tenant at Tenant's sole cost and expense.  In the event Tenant proves that Landlord has overstated any such actual statement of Tenant's Share of Common Expenses, Landlord shall refund such overdue amount to Tenant.~~

9

~~4.4  If the Commencement Date shall occur on a date other than the first day of a Computation Year, Tenant's Share of Taxes and Common Expenses for the Computation Year in which the Commencement Date occurs shall be in the proportion that the number of days from and including the Commencement Date to and including the last day of the Computation Year in which the Commencement Date occurs bears to 365.~~

~~4.5  If the Expiration Date shall occur on a date other than the last day of a Computation Year, Tenant's Share of Taxes and Common Expenses for the Computation Year in which the Expiration Date occurs shall be in the proportion that the number of days from and including the first day of the Computation Year in which the Expiration Date occurs to and including the Expiration Date bears to 365. Notwithstanding the foregoing, Landlord may, pending the determination of the amount of Taxes and Common Expenses for such partial Computation Year, furnish Tenant with statements of estimated Taxes, estimated Common Expenses and Tenant's Share of each thereof for such partial Computation Year. Within thirty (30) days after receipt of such estimated statement Tenant shall remit to Landlord, as Additional Charges, the amount of Tenant's Share of such Taxes and Common Expenses. After such Taxes and Common Expenses have been finally determined and Landlord's Tax Statement and Landlord's Expense Statement have been furnished to Tenant pursuant to Paragraphs 4.2 and 4.3 hereof, respectively, and if there shall have been an underpayment of Tenant's Share of Taxes or Common Expenses, Tenant shall remit the amount of such underpayment to Landlord within thirty (30) days after receipt of such statements, and if there shall have been an overpayment, Landlord shall remit the amount of any such overpayment, to Tenant within thirty (30) days after the issuance of such statements.~~

5. **Construction of Landlord Improvements.**

5.1  Prior to the Commencement Date Landlord will construct the improvements in the Premises as provided in **Exhibit "C"** attached hereto ("Landlord's Improvements"). Landlord's obligation to construct the Landlord's Improvements shall not require Landlord to incur overtime costs and expenses and shall be subject to unavoidable  delays due to acts of God, governmental restrictions, strikes, labor disturbances, shortages of materials and supplies, and due to any other cause or event beyond Landlord's reasonable control. When construction progress so permits, Landlord shall notify Tenant in advance of the approximate date on which construction of the Landlord's Improvements will be substantially completed in accordance with **Exhibit "C"** and will notify Tenant when such work is in fact so completed, which latter notice shall constitute delivery of possession of the Premises to Tenant. If any dispute shall arise as to whether the Premises are substantially completed and ready for Tenant's occupancy, a certificate furnished by Landlord's architect certifying the date of substantial completion shall be conclusive of that fact and date and shall be binding upon Landlord and Tenant. It is understood and agreed by Tenant that any minor changes from any plans or from said **Exhibit "C"** that may be necessary during construction of the Tenant Improvements shall not affect or change this Lease or invalidate same. Landlord warrants that the existing electrical, plumbing, fire sprinkler, HVAC and all other such elements in the Premises shall be in good operating condition upon the Commencement Date of the Lease and that the roof shall be watertight and the roof membrane and the structural elements of the roof, bearing walls and foundations of the Premises shall be free of material defects. If a non-compliance with said warranty exists as of the Commencement Date, Landlord shall, at Landlord's sole cost and expense with respect to such matters, promptly after receipt of written notice from Tenant, setting forth with specificity the nature and extent of such non-compliance, rectify same at Landlord's sole cost and expense. Notwithstanding the foregoing, if, following the Commencement Date, Tenant does not give Landlord written notice of any non-compliance with this warranty within one hundred one-hundred twenty (120) days as to the HVAC and remaining systems and other non-structural elements of the Premises, correction of such non-compliance shall be the obligation of Tenant pursuant to the provisions of this Lease. Furthermore, Landlord warrants that the Premises complies with all laws, orders and regulations of federal, state, county and municipal authorities in effect of the Commencement Date. If the Premises does not comply with said warranty, Landlord shall, promptly after receipt of written notice from Tenant setting forth with specificity the nature and extent of such non-compliance, rectify same at Landlord's sole cost and expense.

5.2  The manner in which the Common Areas are maintained and operated and the expenditures thereof shall be at the sole discretion of  Landlord, and the use of such areas and facilities shall be subject to such commercially reasonable rules and regulations as Landlord shall make from time to time. Landlord shall not be responsible for the nonperformance of any such rules and regulations by any other tenant or occupant of the Center.

5.3  The only purpose of the floor plan(s) attached **Exhibit "B-1/B-2"** is to show the approximate location of the Premises and the Building, and such exhibit(s) is not meant to constitute an agreement as to the construction of the Premises, the rentable area thereof or the specific location of the Common Areas or the elements thereof or of the access ways to the Premises or the Center. Notwithstanding the foregoing, the floor plan for the Premises will be as shown on the attached **Exhibit "B-2"**, subject to any changes which may be required by governmental or quasi-governmental agencies during the plan check process. Landlord hereby reserves the right, at any time and from time to time, to (i) make alterations in or additions to the Center and the Common Areas including, without limitation, changes in the location, size, shape and number of driveways, entrances, parking spaces, parking areas, loading and unloading areas, landscaped areas and walkways, (ii) close temporarily any of the Common Areas for maintenance purposes as long as reasonable access to the Premises and parking remains available, (iii) if required by the JPA or other governmental or quasi-governmental agencies, designate property outside the Center to be part of the Common Areas, (iv) add additional buildings and improvements to the Center and Common Areas and (v) use the Common Areas while engaged in making alterations in or additions or repairs to the Center;

provided that Landlord shall not change the size, location or number of Tenant's 27 non-exclusive parking spaces, or the size or dimensions, visibility or access of the Premises.

6.  **Conduct of Business by Tenant.**

6.1  Tenant shall use and occupy the Premises during the Term of this Lease solely for the use specified in the Basic Lease Information and for no other use or uses without the prior written consent of Landlord. Notwithstanding the foregoing or other provisions of this Lease to the contrary, Tenant shall be responsible for determining that its use of the Premises for the purposes as specified in the Basic Lease Information is in compliance with all applicable laws, zoning restrictions, ordinances and rules and regulations of all governmental or quasi-governmental agencies having jurisdiction over the Premises, including, without limitation, the March Joint Powers Authority ("JPA") and the Western Municipal Water District ("Water District").

6.2  Tenant shall not use or occupy or permit the use or occupancy of the Premises or any part thereof for any use other than the use specifically set forth in Paragraph 6.1, or in any manner that, in Landlord's commercially reasonable judgment, would adversely affect or interfere with (i) any services required to be furnished by Landlord to Tenant or to any other tenant or occupant of the Center, (ii) the proper and economical rendition of any such service or (iii) the use or enjoyment of any part of the Center by any other tenant or occupant.

6.3  The parking spaces to be provided to Tenant pursuant to Paragraph 1.3 shall be used for parking only by vehicles no larger than full-sized passenger automobiles or pick-up trucks. Tenant shall not permit or allow any vehicles that belong to or are controlled by Tenant or Tenant's employees, suppliers, shippers, customers or invitees to be loaded or parked in areas other than those designated by Landlord for such activities. If Tenant permits or allows any of the prohibited activities described in this Paragraph 6.3, Landlord shall have the right, in addition to all other rights and remedies that it may have under this Lease, to remove or tow away the vehicle involved without prior notice to Tenant, and the cost thereof shall be paid to Landlord as Additional Charges within five days after delivery to Tenant of bills thereof.

6.4  Tenant shall not store any property in the Common Areas without the prior written consent of Landlord. In the event that any unauthorized storage shall occur, Landlord shall have the right, in addition to all other rights and remedies that Landlord may have under this Lease, to remove the property without prior notice to Tenant, and the cost thereof shall be paid by Tenant to Landlord within five days after delivery to Tenant of bills thereof.

6.5  Tenant shall not do anything or permit anything to be done in or about the Premises that shall (i) invalidate or be in conflict with the provisions of any fire or other insurance policies covering the Building or the Center or any property located therein, (ii) result in a refusal by fire insurance companies of good standing to insure the Building or the Center or any such property in amounts reasonably satisfactory to Landlord, (iii) subject Landlord to any liability or responsibility for injury to any person or property by reason of any inherently dangerous business operation being conducted in or about the Premises or (iv) cause any increase in the fire insurance rates applicable to the Building or property located therein at the beginning of the Term or at any time thereafter. Tenant, at Tenant's expense, shall comply with all rules, orders, regulations and requirements of the American Insurance Association (formerly the National Board of Fire Underwriters) and of any similar body that shall hereafter perform the function of such Association affecting the Premises insofar as any thereof relate to or affect the condition, use or occupancy of the Premises.

6.6  Tenant agrees that this Lease is subject and subordinate to the Project CC&Rs (as defined below), as the same may now or hereafter exist, and that Tenant will execute and deliver to Landlord, within twenty (20) days of Landlord's written request therefor, any further documentation which Landlord deems necessary or desirable to evidence such subordination; provided same shall not does not materially interfere with Tenant's use and enjoyment of the Premises or the conduct of Tenant's business, or materially increase Common Expenses or other amounts payable by Tenant under this Lease or such documents. Without limiting the provisions of this Paragraph 6.6, Tenant shall throughout the Lease Term (as may be extended) timely comply with all of the terms, provisions, conditions and restrictions of the Project CC&Rs which pertain to, restrict or affect the Premises or Tenant's use thereof, or Tenant's use of the common area within the Center or any other area of the Center permitted hereunder, . Tenant shall hold Landlord and the Premises harmless and shall indemnify, protect and defend Landlord from and against any loss, expense, damage, attorneys' fees and costs or liability to the extent caused by the failure of Tenant to so perform or comply with the Project CC&Rs. Tenant agrees that it will subordinate this Lease to any other covenants, conditions and restrictions and any reciprocal easement agreements or any similar agreements which Landlord may hereafter record against the Premises or any portion thereof, provided that such subordination does not materially interfere with Tenant's use and enjoyment of the Premises or the conduct of Tenant's business or materially increase Common Expenses or other amounts payable by Tenant under this Lease or such documents. For purposes hereof, the term "Project CC&Rs" means those certain Declaration of Restrictions, Grant of Easements and Maintenance Agreement affecting the Center which Landlord either has or will record against the Center. Tenant acknowledges that Landlord has heretofore delivered to Tenant a copy of the Project CC&Rs, and Tenant acknowledges that it has reviewed and approves the Project CC&Rs.

6.7 Within ten (10) days after the Lease Date, Tenant shall complete, execute and deliver to the Water District an Industrial Waste Survey in the form attached hereto as **Exhibit "F"** ("Industrial Waste Survey"). Tenant acknowledges having been informed by Landlord that the Water District's obligation to provide water and sewer service to the Premises is conditioned upon the Water District's receipt of an Industrial Waste Survey completed by Tenant.

## 7.  **Alterations and Tenant's Property.**

7.1  Tenant shall not make or permit any alterations, installations, additions or tenant's improvements (collectively "Alterations") in, on or about the Premises without the prior written consent of Landlord, not to be unreasonably withheld or delayed, except for nonstructural Alterations not exceeding the "Alterations Limit," set forth in Basic Lease Information Paragraph 16, in any twelve (12) month period.  All Alterations shall be constructed pursuant to plans and specifications approved in advance in writing by Landlord prior to installation, which approval may not be unreasonably withheld.  Any review or approval by Landlord of any plans or specifications with respect to any Alterations is solely for Landlord's benefit, and without any representation or warranty whatsoever to Tenant with respect to the adequacy, correctness or efficiency thereof or otherwise.    All Alterations shall be installed by a duly licensed contractor at Tenant's sole cost and expense and in compliance with all applicable laws and covenants, conditions and restrictions of record. Tenant's contractor must obtain and keep in full force and effect during construction comprehensive general liability insurance with at least $1,000,000 coverage and worker's compensation insurance: statutory limits.  Prior to commencement of construction of any Alterations, Tenant shall deliver to Landlord certificates of insurance evidencing such insurance coverage. The work shall be done in a good and workmanlike manner conforming in quality and design with the Premises existing as of the Commencement Date, and shall not diminish the value of the Premises.  Tenant shall, if reasonably required by Landlord, obtain and pay for, at its own expense, a completion and indemnity bond, the form and amount of which shall be subject to the approval of Landlord.

7.2  All appurtenances, fixtures, improvements, additions and other property attached to or installed in the Premises whether by Landlord or by or on behalf of Tenant, and whether at Landlord's expense or Tenant's expense or at the joint expense of Landlord and Tenant, shall be and remain the property of Landlord.  Any furnishings and personal property installed in the Premises that are removable without material damage to the Building or the Premises whether the property of Tenant or leased by Tenant are herein sometimes called "Tenant's Property."  Any replacements of any property of Landlord, whether made at Tenant's expense or otherwise, shall be and remain the property of Landlord.

7.3  Any of Tenant's Property remaining on the Premises at the expiration of the Term shall be removed by Tenant at Tenant's cost and expense and Tenant shall, at its cost and expense, repair any damage to the Premises or the Building caused by such removal.  Any of Tenant's Property not removed from the Premises prior to the expiration of the Term shall, at Landlord's option, become the property of Landlord, or Landlord may remove such Tenant's Property and Tenant shall pay to Landlord the cost of removal within ten days after delivery of a bill thereof.

## 8.  **Landlord's Repairs.**

Except for damage or wear and tear resulting from the omission, negligence or willful misconduct of Tenant or any person claiming through or under Tenant, or any of their employees, suppliers, shippers, customers or invitees, Landlord shall keep in good condition and repair the foundations, roof structure, exterior walls and structural condition of interior bearing walls of the Premises as well as the parking lots, walkways, driveways, landscaping, fences, signs and utility installations of the Common Areas.  Landlord shall not, however, be obligated to paint the exterior or interior surface of exterior walls, nor shall Landlord be required to maintain, repair or replace windows, doors or plate glass of the Premises.  Landlord shall not be liable for and except as provided in Paragraphs 13 and 16 hereof and except in the event of the negligence or willful misconduct of Landlord, its agents, representatives, contractors and/or employees, there shall be no abatement of Rent with respect to, any injury to or interference with Tenant's business arising from any repair, maintenance, alteration or improvement in or to (i) any portion of the Center or the Building, including the Premises, or (ii) the fixtures, appurtenances and equipment therein.  Tenant hereby waives and releases its right to make repairs at Landlord's expense under Sections 1941 and 1942 of the California Civil Code or under any similar law, statute or ordinance now or hereafter in effect.  Tenant agrees that (a) the cost of routine maintenance and periodic inspection of the roof as included in a maintenance contract with a roofing contractor;  and (c) the periodic repainting of the exterior walls of the Premises, shall be prorated to each building and multiple premises within each building based on the rentable square footage contained therein, and that any such amounts prorated to the Premises for these items shall be paid by the Tenant within ten (10) days after the receipt from Landlord of appropriate statements thereof.

## 9.  **Tenant's Repairs.**

9.1  Subject to the provisions of Paragraphs 5.1 above and except for items of maintenance and repair which are Landlord's obligation to perform pursuant to Paragraph 8 above, Tenant, at Tenant's cost and expense, shall make all repairs and replacements, structural and otherwise, as and when Landlord deems necessary to preserve in good working order and condition the Premises and every part thereof including, without limitation, all plumbing, heating, ventilating and air conditioning systems, electrical and lighting facilities and equipment within the Premises, fixtures, roof membrane, interior walls, interior and exterior surfaces of exterior walls (including, without limitation, painting the exterior of the Building as and

12

when reasonably required by Landlord to maintain the clean and sanitary appearance of the Building, which paint shall conform in color and quality with the existing exterior paint, as determined by Landlord), ceilings, windows, doors, plate glass and skylights located within the Premises. At Landlord's option, either Tenant shall procure and maintain, at Tenant's expense, a ventilating and air conditioning system maintenance contract reasonably satisfactory to Landlord, or Landlord shall procure and maintain a ventilating and air conditioning system maintenance contract in a form customary for industrial buildings similar in size and location to the Building. If Landlord elects to procure and maintain the ventilating and air conditioning system maintenance contract, Tenant shall pay to Landlord from time to time, within thirty (30) days after delivery of a statement thereof, the cost of such contract. Tenant shall have the benefit of all warranties available to Landlord regarding the equipment in the ventilating and air conditioning system.

9.2 All repairs and replacements required to be made by or on behalf of Tenant or any person claiming through or under Tenant shall be made and performed (i) at Tenant's cost and expense, (ii) by contractors or mechanics approved by Landlord, (iii) so that same shall be at least equal in quality, value and utility to the original work or installation and (iv) in accordance with the rules and regulations of the Center adopted by Landlord from time to time and in accordance with all applicable laws and regulations of governmental authorities having jurisdiction over the Premises. Without relieving Tenant of liability resulting from Tenant's failure to exercise and perform the Tenant maintenance described in paragraphs 9.1 and 9.2 hereof, if the HVAC unit cannot be repaired other than at a cost greater than fifty percent of the cost of replacing the HVAC unit, then the HVAC unit shall be replaced by Landlord and the cost thereof shall be shared between Landlord and Tenant as follows: Landlord's Share: the sum of number of months in Lease less total number of months remaining in the Lease divided by the number of months in the Lease multiplied by the replacement cost. Tenant Share: the number of months remaining in the Lease divided by the number of months in the Lease multiplied by the replacement cost. Tenant will be obligated to pay its share in equal monthly installments during the remainder of the term of the lease on the date on which rent is due. Upon vacancy at end of the Term, or Extended Term, as the case may be, Tenant shall leave the Premises in clean, sanitary, and broom-swept condition.

10. **Abandonment.**

Tenant shall not vacate or abandon the Premises at any time during the term of this Lease for a period of thirty (30) consecutive days, and if Tenant shall abandon, vacate or surrender the Premises or be dispossessed by process of law or otherwise, any personal property belonging to Tenant and left on the Premises shall be deemed to be abandoned, at the option of Landlord, except such property as may be mortgaged to or otherwise subject to a security interest in favor of Landlord.

11. **Liens**.

Tenant shall keep the Premises free from any liens arising out of any work performed, materials furnished or obligations incurred by or for Tenant or any person or entity claiming through or under Tenant. In the event that Tenant shall not, within ten days following the imposition of any such lien, cause same to be released of record by payment or posting of a proper bond, Landlord shall have, in addition to all other remedies provided herein and by law, the right but not the obligation to cause such lien to be released by such means as it shall deem proper, including payment of the claim giving rise to such lien. All such sums paid by Landlord and all expenses incurred by it in connection therewith shall be considered Additional Charges and shall be payable to Landlord by Tenant on demand. Landlord shall have the right at all times to post and keep posted on the Premises any notices permitted or required by law, or that Landlord shall deem proper for the protection of Landlord, the Premises, the Building, the Center and any other party having an interest therein, from mechanics' and materialmens' liens and Tenant shall give to Landlord at least five business days' prior notice of commencement of any construction on the Premises, except for emergency repairs or minor repairs or Alterations otherwise permitted hereunder without prior notice to Landlord.

12. **Assignment and Subletting.**

12.1 Tenant shall not directly or indirectly, voluntarily or by operation of law, sell, assign, encumber, pledge or otherwise transfer or hypothecate all or any part of the Premises or Tenant's leasehold estate hereunder (collectively, "Assignment"), or permit the Premises to be occupied by anyone other than tenant or sublet the Premises (collectively, "Sublease") or any portion thereof without Landlord's prior written consent in each instance, which consent shall not be unreasonably withheld. Landlord's consent to an Assignment of this Lease or a Sublease of the Premises or any portion thereof, may be withheld, and shall not be deemed to be unreasonably withheld, if such refusal to consent is based upon commercially reasonable grounds, including, but not limited to (a) the credit worthiness of such subtenant or assignee; or (b) the suitability of the Premises for the intended use by such subtenant or assignee, or (c) the general business reputation of such subtenant or assignee.

12.2 If Tenant desires at any time to enter into an Assignment of this Lease or a Sublease of the Premises or any portion thereof, it shall first give written notice to Landlord of its desire to do so, which notice shall contain (a) the name of the proposed assignee, subtenant or occupant, (b) the nature of the proposed assignee's, subtenant's or occupant's business to be carried on in the Premises, (c) the terms and provisions of the proposed Assignment or Sublease, and (d) such financial information as Landlord may reasonably request concerning the proposed assignee, subtenant or occupant. Tenant shall reimburse Landlord for Landlord's reasonable attorneys' fees (not to exceed $1,000) incurred in connection with the processing and documentation of any requested Assignment of this Lease or Sublease of the Premises.

12.3  At any time within thirty (30) days after Landlord's receipt of any notice specified in Paragraph 12.2, Landlord may, by written notice to Tenant, elect to (a) terminate this Lease as to the portion (including all) of the Premises that is specified in Tenant's notice, with a proportionate abatement in the Rent but, in the case of a proposed sublease, only if the term of the proposed sublease is for 75% or more of the remainder of the Lease Term, (b) consent to the Sublease or Assignment, or (c) disapprove the Sublease or Assignment.  In the event Landlord elects the option set forth in Subsection (a) above, with respect to a portion of the Premises, (i) Tenant shall at all times provide reasonable and appropriate access to such portion of the Premises and use of any common facilities and (ii) Landlord shall have the right to use such portion of the Premises for any legal purpose in its sole discretion and the right to further lease, assign or sublease the portion of the Premises subject to Landlord's election without the consent of Tenant. If Landlord consents to the Sublease or Assignment within said 60-day period, Tenant may thereafter, within 90 days after Landlord's consent but not later than the expiration of said 90 days, enter into such Assignment or Sublease of the Premises or portion thereof upon the terms and conditions set forth in the notice furnished by Tenant to Landlord pursuant to Paragraph 12.2.

12.4  No consent by Landlord to any Assignment or Sublease by Tenant shall relieve Tenant of any obligation to be performed by Tenant under this Lease whether arising before or after the Assignment or Sublease.  The consent by Landlord to any Assignment or Sublease shall not relieve Tenant of the obligation to obtain Landlord's express written consent to any other Assignment of Sublease.   Any Assignment or Sublease that is not in compliance with this Paragraph 12 shall be void and, at the option of Landlord, shall constitute a material Default by Tenant under this Lease without the benefit of any cure period.  The acceptance of Rent or Additional Charges by Landlord from a proposed assignee or sublessee shall not constitute the consent by Landlord to such Assignment or Sublease.

12.5  If  for any Assignment of this Lease or a Sublease of the Premises, Tenant receives rent or other consideration, either initially or over the term of the Sublease or Assignment, in excess of Rent called for hereunder, or in case of the Sublease of a portion of the Premises, in excess of such Rent fairly allocable to such portion, within thirty (30) days following its receipt thereof, Tenant shall pay to Landlord, as Additional Charges hereunder, fifty percent (50%) of the excess of such payment of Rent or other consideration in excess of the Rent called for hereunder.  For the purposes of this Paragraph, the term "rent" shall mean all consideration paid or given, directly or indirectly, for the use of the Premises or any portion thereof.  The term "consideration" shall mean and include money, services, property or other things of value such as payment of costs, cancellation of indebtedness, discounts, rebates and the like.  Any rent or other consideration which is to be passed through to Landlord by Tenant pursuant to this Paragraph shall be paid to Landlord within thirty (30) days following receipt by Tenant and shall be paid in cash (for these purposes, "cash" includes a check backed with good funds) or cashier's check, irrespective of the form in which it was received by Tenant from any subtenant or assignee.  In the event that any rent or other consideration received by Tenant from a subtenant or an assignee is in a form other than cash, Tenant shall pay the Landlord in cash or cashier's check the fair value of such consideration.

12.6  Except for transfers to family members or for estate planning purposes, aAny sale or other transfer, including transfer by consolidation, merger or reorganization, of a majority of the voting stock of the Tenant, if Tenant is a corporation, or any sale or other transfer of a majority of a partnership interests in Tenant, if Tenant is a partnership, shall be an Assignment for purposes of this Paragraph 12.  As used in this Paragraph 12.6, the term "Tenant" shall also mean any entity that has guaranteed Tenant's obligations under this Lease, and the prohibition hereof shall be applicable to any sales or transfers of the stock or partnership interests of said guarantor.

12.7  Each assignee, sublessee or other transferee other than Landlord shall assume, as provided in this Paragraph 12.7, all obligations of Tenant under this Lease and shall be and remain liable jointly and severally with Tenant for the payment of Rent and Additional Charges and for the performance of all of the terms, covenants, conditions and agreements herein contained on Tenant's part to be performed for the Term; provided, however, that the assignee, sublessee or other transferee shall be liable to Landlord for rent only in the amount set forth in the Assignment or Sublease.  No Assignment shall be binding on Landlord unless the assignee or Tenant shall deliver to Landlord a counterpart of the Assignment and an instrument in recordable form that contains a covenant of assumption by the assignee satisfactory in substance and form to Landlord consistent with the requirements of this Paragraph 12.7, but the failure or refusal of the assignee to execute such instrument of assumption shall not release or discharge the assignee from its liability as set forth above.

13.  **Compliance with Laws.**

13.1  Tenant, at Tenant's cost and expense, shall comply with all laws, orders and regulations of federal, state, county and governmental or quasi-governmental authorities and/or agencies (including, without limitation, the JPA and the Water District) and with all directions, pursuant to law, of all public officers, that shall impose any duty upon Landlord or Tenant with respect to the Premises or the use or occupancy thereof, except that Tenant shall not be required to make any structural alterations or other capital improvements in order to comply unless necessitated or occasioned due to Tenant's specific use of the Premises or any Alterations made or proposed by Tenant (including, without limitation, improvements required to comply with the Americans with Disabilities Act), in which case such structural alterations or other capital improvements shall be made by Tenant at its sole cost and expense.  Landlord shall make capital improvements required by governmental agencies (including, without limitation, improvements required by the Americans with Disabilities Act) to the extent not necessitated or occasioned due to Tenant's specific use of the Premises or any Alterations made or proposed by Tenant, subject to Landlord's right to include the costs thereof in Common Expenses so long as the legal requirement giving rise to the

14

need for any such improvement is first enacted after the Commencement Date.

13.2  For the purpose of this Lease, "Applicable Environmental Law" shall mean any local, state or federal statutory, regulatory or case law pertaining to health or the environment, or in any way regulating the generation, treatment, storage, disposal, release, production, use, transportation or manufacture of oil or petroleum products, flammable explosives, asbestos, urea formaldehyde, radioactive materials or waste or any other toxic or hazardous substances, wastes or materials ("Hazardous Materials") as defined or regulated by local, state or federal law, ordinance, rule or regulation.

Tenant shall not make, or permit its officers, employees, agents, contractors, shippers, suppliers, vendors, customers, licensees or invitees to make, the generation, treatment, storage, disposal, release, production, use, transportation or manufacture (collectively, "Regulated Activities") of any Hazardous Materials, in, at, on, under, around and/or about all or any portion of the Premises or the Center, except in compliance with all Applicable Environmental Laws, which compliance shall be at Tenant's sole cost and expense, and Tenant shall keep the Premises free of any lien imposed in connection therewith. In the event Tenant fails to do so, following notice from Landlord and Tenant's failure to cure within a reasonable time following such notice (which shall not be less than thirty (30) days following notice except in the case of an emergency or unless a shorter time period is required to prevent risk of harm to health or property or to prevent the migration or exacerbation of Hazardous Materials), Landlord may, but shall not be obligated to, do either or both of the following: (i) declare a Default under this Lease, or (ii) cause the Premises to be freed from the Hazardous Materials, in which event the cost of the removal shall be Additional charges due and payable to Landlord by Tenant immediately on demand.  Tenant shall indemnify and hold Landlord free and harmless from and against all loss, cost, damage (including consequential damages suffered by third-party claimants) or expense (including, without limitation, attorneys' fees and costs, and appellate counsel fees and costs, incurred in the investigation of the Premises and the investigation, defense and settlement of claims) that Landlord may sustain as a result of or in connection with compliance by Landlord with any compliance is necessitated by Tenant's failure to comply with its obligations under this paragraph 13.

In the event Landlord reasonably believes there may be a violation of Applicable Environmental Law by Tenant, Tenant shall provide, upon Landlord's request and at Tenant's sole cost and expense, an inspection or audit ("Inspection") of the Premises by an engineering or consulting firm selected by Landlord indicating the presence or absence of Hazardous Materials in, at, on, under, around and/or about all or any portion of the Premises.  If Tenant fails to provide an Inspection within 15 days after written notice, then Landlord may order it.  Tenant shall grant to Landlord and its employees and agents access to the Premises at all reasonable times, including but not limited to all rights provided to Landlord under Paragraph 24, to undertake such Inspections as Landlord deems necessary to ensure that the Tenant and the Premises are in compliance with all Applicable Environmental Laws.  Landlord, its agents and employees shall also have access to the Premises without notice if, in the reasonable discretion of Landlord, material or irreparable harm to the environment, the Premises or persons is imminent. In the event Hazardous Materials are found to be present, the cost of any such Inspection shall be Additional charges hereunder and shall be immediately due and payable by Tenant (a) when incurred and without notice, if incurred by Tenant, and (b) upon demand, if incurred by Landlord.

Tenant represents and warrants to Landlord that (a) Tenant is not in violation of or subject to any existing, pending or threatened investigation or inquiry by any governmental authority and has not incurred any response costs or remedial obligations under any Applicable Environmental Law; (b) this representation and warranty would continue to be true and correct following disclosure to the applicable governmental authorities of all relevant facts, conditions and circumstances, if any, pertaining to the Premises or any other premises previously occupied by Tenant; and (c) Tenant has not obtained and is not required to obtain any permit, license or similar authorization to occupy, operate or use all or any portion of the Premises by reason of any Applicable Environmental Law.  Tenant shall pay any fines, charges, fees, expenses, damages, losses, liabilities, or response costs to the extent caused by Tenant's failure to comply with the provisions of this Paragraph 13 and to indemnify and save Landlord harmless from any and all judgments, fines, charges, fees, expenses, damages, losses, liabilities, response costs, or attorneys' fees and expenses arising therefrom, including, but not be limited to, any such item arising due to the invalidity of or increase in the premium cost of any insurance carried with respect to the Premises; and this indemnity shall survive the termination of this Lease.  Tenant agrees to notify Landlord promptly in writing in the event that any governmental agency or other entity notifies Tenant that it intends to inspect the Premises or that it may not be in compliance with any Applicable Environmental Law.

13.3  Landlord has delivered to Tenant a copies of (i) that certain Phase I Environmental Site Assessment, dated July 2004, prepared by EDF~Associates, (ii) that certain Ground Water Sampling Report prepared by EDF dated 3/21/05, (iii) that certain No Further Action letter dated 12/13/04 from CRWQCB, (iv) that certain Lennar internal memo dated 1/6/05 regarding review of remediation of Hydrocarbon-impacted soil, and (v) that certain Evaluation of Disposal of West March Petroleum Hydrocarbon Contamination Report (collectively, the "Environmental Information").  Landlord warrants and represents to Tenant that, to Landlord's actual knowledge (without independent investigation), except as set forth in the Environmental Information, (i) no portion of the Building or the Center contains any Hazardous Materials, and (ii) Landlord is not subject to any existing investigation by any governmental authority under any Applicable Environmental Law. If during the Lease Term Hazardous Materials are hereafter discovered in the Premises or other portions of the Center owned by Landlord, and the presence of such Hazardous Materials is not the result of either Tenant's use of the Premises or any act or omission of Tenant or its officers, employees, agents, contractors, shippers, suppliers, vendors, customers, licensees or invitees, and the presence of such Hazardous Materials results in any contamination of the Premises or

other portions of the Center that requires remediation under Applicable Environmental Law, then Landlord shall promptly, take all actions as are necessary to remediate such Hazardous Materials and as may be required by Applicable Environmental Law or seek remediation of such Hazardous Materials by the responsible party, subject to Landlord's right to include the costs thereof in Common Expenses pursuant to Paragraph 4 above.

14.  **Subordination**.

Without the necessity of any additional document being executed by Tenant for the purpose of effecting a subordination, Tenant agrees that this Lease shall be subject and subordinate at all times to (i) all ground leases or underlying leases that may now exist or hereafter be executed affecting the Building or the Center or both and (ii) the lien of any mortgage or deed of trust that may now exist or hereafter be executed in any amount for which the Building, the Center, any ground leases or underlying leases, or Landlord's interest or estate in any of said items is specified as security.  Notwithstanding the foregoing, Landlord shall have the right to subordinate or cause to be subordinated to this Lease any such ground leases or underlying leases or any such liens.  In the event that any ground lease or underlying lease terminates for any reason or any mortgage or deed of trust is foreclosed or a conveyance in lieu of foreclosure is made for any reason, Tenant shall, notwithstanding any subordination to this Lease of any ground lease, underlying lease or lien, attorn to and become the Tenant of the successor-in-interest to Landlord at the option of such successor-in-interest.  Tenant covenants and agrees to execute and deliver, within ten (10) days after demand by Landlord and in the form reasonably requested by Landlord, any additional documents evidencing the priority or subordination of this Lease with respect to any such ground leases or underlying leases or the lien of any such mortgage or deed of trust, provided that delivery of such documents shall be conditioned upon the party benefited thereby delivering to Tenant an agreement that Tenant's tenancy will not be disturbed in the event of a default of Landlord as long as Tenant is not in Default under this Lease.

15.  **Inability to Perform.**

If, after Landlord delivers the Premises to Tenant with the telephone, electricity and water lines serving the Premises activated, by reason of the occurrence of any of the events of unavoidable delay specified in Paragraph 5.1, Landlord is unable to furnish or is delayed in furnishing any utility or service required to be furnished by Landlord under the provisions of this Lease or of any collateral instrument, or is unable to perform or make or is delayed in performing or making any installations, repairs, alterations, additions or improvements, whether required to be performed or made under this Lease or under any collateral instrument, or is unable to fulfill or is delayed in fulfilling any of Landlord's other obligations under this Lease or any collateral instrument, no such inability or delay shall constitute an actual or constructive eviction, as a whole or in part, or entitle Tenant to any abatement or diminution of Rent or Additional Charges, or relieve Tenant from any of its obligations under this Lease, or impose any liability upon Landlord or its agents by reason of inconvenience or annoyance to Tenant or by reason of injury to or interruption of Tenant's business, or otherwise, unless due to the gross negligence or willful act of Landlord.  Tenant hereby waives and releases its right to terminate this Lease under Section 1932(1) of the California Civil Code or under any similar law, statute or ordinance now or hereafter in effect.  Notwithstanding anything to the contrary contained in the foregoing, (i) if an interruption or cessation of utility service results from Landlord's gross negligence or willful act and the Premises are not usable by Tenant for the conduct of Tenant's business as a result thereof, then if such interruption continues for three (3) consecutive business days after the date Tenant gives Landlord notice of such interruption, Monthly Rent shall be abated for the period beginning on the date of interruption of service until such utilities are restored; and (ii) if such cessation of utility service to the Premises continues for more than thirty (30) consecutive days, results from Landlord's gross negligence  and the Premises are not usable by Tenant for the conduct of Tenant's business as a result thereof, then, unless within such thirty (30) day period Landlord provides an alternative source of the applicable utility to the extent that Tenant can continue the conduct of its business substantially as it was conducted before the utility service was interrupted, Tenant shall have the right to terminate this Lease by giving written notice of termination to Landlord prior to the date on which such utility service is restored.

16.  **Damage or Destruction.**

16.1  **Definitions**.

(a)  "Premises Partial Damage" shall herein mean damage or destruction to the Premises to the extent that the cost of repair is less than fifty percent (50%) of the then replacement cost of the Premises.

(b)  "Premises Total Destruction" shall herein mean damage or destruction to the Premises to the extent that the cost of repair is fifty percent (50%) or more of the then replacement cost of the Premises.

(c)  "Insured Loss" shall herein mean damage or destruction which was caused by an event covered by the insurance described in Paragraph 23 below.

16

16.2  **Partial Damage - Insured Loss.**  Subject to the provisions of Paragraphs 16.4, 16.5 and 16.6 below, if at any time during the Term of this Lease there is damage which is an Insured Loss and which falls within the classification of (a) Premises Partial Damage, or (b) partial damage to the Common Area which materially affects Tenant's use of the Premises, then Landlord shall, at Landlord's expense, repair such damage, but not Tenant's fixtures, equipment, Alterations or Tenant Improvements unless the same have become a part of the Premises, as soon as reasonably possible and this Lease shall continue in full force and effect

16.3  **Partial Damage - Uninsured Loss.**  Subject to the provisions of Paragraphs 16.4, 16.5 and 16.6 below, if at any time during the Term of this Lease there is damage which is not an Insured Loss and which falls within the classification of (a) Premises Partial Damage, or (b) partial damage to the Common Area which materially affects Tenant's use of the Premises, Landlord may at Landlord's option either (i) repair such damage as soon as reasonably possible at Landlord's expense, in which event this Lease shall continue in full force and effect, or (ii) give written notice to Tenant within 30 days after the date of the occurrence of such damage of Landlord's intention to cancel and terminate this Lease, as of the date of the occurrence of such damage.  In the event Landlord elects to give such notice of Landlord's intention to cancel and terminate this Lease, Tenant shall have the right within ten (10) days after the receipt of such notice to give written notice to Landlord of Tenant's intention to repair such damage at Tenant's expense, without reimbursement from Landlord, in which event this Lease shall continue in full force and effect, and Tenant shall proceed to make such repairs as soon as reasonably possible.  If Tenant does not give such notice within such ten (10) day period this Lease shall be cancelled and terminated as of the date of the occurrence of such damage.

16.4  **Total Destruction.**  If at any time during the Term of this Lease, there is damage, whether or not an Insured Loss, which falls within the classification of Premises Total Destruction, this Lease shall automatically terminate as of the date of such Premises Total Destruction.

16.5  **Damage Near End of Term.**

16.5.1  If at any time during the last six months of the Term of this Lease there is damage, whether or not an Insured Loss, which falls within the classification of Premises Partial Damage, Landlord may at Landlord's option cancel and terminate this Lease as of the date of the occurrence of such damage by giving written notice to Tenant of Landlord's election to do so within 30 days after the date of the occurrence of such damage.

16.5.2  Notwithstanding Paragraph 16.5.1 above, in the event that Tenant has an option to extend or renew this Lease, and the time within which said option may be exercised has not yet expired, Tenant shall exercise such option, if it is to be exercised at all, no later than 20 days after the occurrence of an Insured Loss falling within the classification of Premises Partial Damage during the last six months of the Term of this Lease.  If Tenant duly exercises such option during said 20 day period, Landlord shall, at Landlord's expense, repair such damage as soon as reasonably possible and this Lease shall continue in full force and effect.  If Tenant fails to exercise such option during said 20 day period, then Landlord may at Landlord's option terminate and cancel this Lease as of the expiration of said 20 day period by giving written notice to Tenant of Landlord's election to do so within 10 days after the expiration of said 20 day period, notwithstanding any term or provision in the grant of option to the contrary.

16.6  **Abatement of Rent; Tenant's Remedies.**  In the event of damage described in Paragraph 16.2 or 16.3 above, and Landlord or Tenant repairs or restores the Premises pursuant to the provisions of this Paragraph 16, the Rent payable hereunder for the period during which such damage, repair or restoration continues shall be abated in proportion to the degree to which Tenant's use of the Premises is impaired; provided, however, if the damage is caused by a negligent act of Tenant, Tenant's agents, servants, employees or invitees, then Tenant shall not be entitled to any abatement of rent except to the extent business interruption or loss of income insurance proceeds have been received by Landlord from insurance obtained by Tenant.  Except for abatement of rent, if any, Tenant shall have no claim against Landlord for any damage suffered by reason of any such damage, destruction, repair or restoration, unless such damage was caused by the negligence or willful misconduct of Landlord, its agents or employees.

16.7  **Liability.**  Except as otherwise provided in Paragraph 23.8 below, nothing contained in this Lease shall relieve either party of any liability to the other party or to its insurance carriers that such party may have under law or under the provisions of this Lease in connection with any damage to the Premises or the Building or Tenant's Property or alterations or any other property of Tenant by fire or other casualty.

16.8  **Damage by Tenant.**  Notwithstanding anything contained herein to the contrary, if any such damage is due to the fault or neglect of Tenant, any person claiming through or under Tenant or any of their employees, suppliers, shippers, customers or invitees, then there shall be no abatement of Rent or Additional Charges by reason of such damage, unless Landlord is reimbursed for such abatement of Rent or Additional Charges pursuant to any rental insurance policies that Landlord may, in its sole discretion, elect to carry.

16.9  **Tenant's Termination Right.**  If at any time during the Term of this Lease there is damage due to the occurrence of a casualty and the damage cannot reasonably be restored within two hundred thirty (230) days from the date of the casualty, then Tenant shall have the right to terminate this Lease by delivering written notice to Landlord no later than thirty (30) days after the date of the casualty. Additionally, if there is damage due to the occurrence of a casualty and the damage is not actually restored

17

within two hundred thirty (230) days from the date of the casualty, then Tenant shall have the right for the fifteen (15) days following the expiration of such period to terminate this Lease upon prior written notice to Landlord; provided, however, this Lease shall automatically be reinstated if the restoration is substantially completed and the Premises are delivered to Tenant within ten (10) business days after Tenant's termination notice.

16.10  **Waiver**.  The provisions of this Lease, including this Paragraph 16, constitute an express agreement between Landlord and Tenant with respect to any and all damage to, or destruction of, all or any part of the Premises, the Building or any other portion of the Center and any statute or regulation of the State of California including, without limitation, Sections 1932(2) and 1933(4) of the California Civil Code with respect to any rights or obligations concerning damage or destruction in the absence of an express agreement between the parties and any similar statute or regulation now or hereafter in effect shall have no application to this Lease or to any damage to or destruction of all or any part of the Premises, the Building or any other portion of the Center.

17.  **Eminent Domain**.

17.1  If all of the Premises is condemned or taken in any manner for public or quasi-public use including, but not limited to, a conveyance or assignment in lieu of a condemnation or taking, this Lease shall automatically terminate as of the earlier of the date of the vesting of title or the date of dispossession of Tenant as a result of such condemnation or other taking.  If a part of the Premises is so condemned or taken, this Lease shall automatically terminate as to the portion of the Premises so taken as of the earlier of the date of the vesting of title or the date of dispossession of Tenant as a result of such condemnation or taking.  If such portion of the Building or Center is condemned or otherwise taken so as to require, in the opinion of Landlord, a substantial alteration or reconstruction of the remaining portions thereof, this Lease may be terminated by Landlord as of the earlier of the date of the vesting of title or the date of dispossession of Tenant as a result of such condemnation or taking by written notice to Tenant within 60 days following notice to Landlord of the date on which said vesting or dispossession will occur.  If such portion of the Premises is taken so as to render the remaining portion untenantable and unusable by Tenant, this Lease may be terminated by Tenant as of the earlier of the date of the vesting of title or the date of dispossession of Tenant as a result of such condemnation or taking by written notice to Landlord within 60 days following notice to Tenant of the date of which said vesting or dispossession will occur.

17.2  Landlord shall be entitled to the entire award in any condemnation proceeding or other proceeding for taking for public or quasi-public use including, without limitation, any award made for the value of the leasehold estate created by this Lease.  No award for any partial or entire taking shall be apportioned and Tenant hereby assigns to Landlord any award that may be made in such condemnation or other taking together with any and all rights of Tenant now or hereafter arising in or to same or any part thereof; provided, however, that nothing contained herein shall be deemed to give Landlord any interest in, or to require Tenant to assign to Landlord, any award made to Tenant specifically for its relocation expenses, the taking of personal property and fixtures belonging to Tenant or the interruption of or damage to Tenant's business.

17.3  In the event of a partial condemnation or other taking that does not result in a termination of this Lease as to the entire Premises, the Rent and Additional Charges shall abate in proportion to the portion of the Premises taken by such condemnation or other taking.

17.4  If all or any portion of the Premises is condemned or otherwise taken for public or quasi-public use for a limited period of time, this Lease shall remain in full force and effect and Tenant shall continue to perform all terms, conditions and covenants of this Lease; provided, however, that Rent and Additional Charges shall abate during such limited period in proportion to the portion of the Premises that is rendered untenantable and unusable as a result of such condemnation or other taking.  Subject to Tenants rights articulated in Paragraph 17.2 above, Landlord shall be entitled to receive the entire award made in connection with any such temporary condemnation or other taking.

18.  **Utilities.**

18.1  Tenant shall pay for all water, gas, heat, light power, telephone and other utilities and services supplied for the Premises together with any taxes thereon.  If any such services are not separately metered to the Premises, Tenant shall pay, at Landlord's option, either Tenant's Share or a reasonable proportion, to be determined by Landlord in its commercially reasonable discretion, of all charges jointly metered with other premises in the Building or the Center.  Except as otherwise provided in Paragraph 5.1 above, Landlord makes no representation with respect to the adequacy or fitness of the air conditioning or ventilation equipment in the Building to maintain temperatures that may be required for, or because of, any equipment of Tenant other than normal fractional horsepower office equipment, and Landlord shall have no liability for loss or damage in connection therewith.

18.2  In the event any governmental entity promulgates or revises any statute, ordinance or building, fire or other code or imposes mandatory or voluntary controls or guidelines on Landlord or the Center or any part thereof, relating to the use or conservation of energy, water, gas, light or electricity, or the reduction of automobile or other emissions, or the provision of any other utility or service provided with respect to this Lease, or in the event Landlord is required or elects to make alterations to the Building or any other part of the Center in order to comply with such mandatory or voluntary controls or guidelines, Landlord may, in its sole discretion, require Tenant to comply with such mandatory or voluntary controls or guidelines or Landlord may, in its reasonable discretion, make such alterations to the Building or any other

0024

part of the Center related thereto.  Such compliance and the making of such alterations shall in no event entitle Tenant to any damages, relieve Tenant of the obligation to pay the full Rent and Additional Charges reserved hereunder or constitute or be construed as a constructive or other eviction of Tenant.

19.  **Default.**

19.1  Each of the following acts or omissions of Tenant shall constitute a **"Default"**:

(a)  Failure or refusal to pay Rent, Additional Charges or any other amount to be paid by Tenant to Landlord hereunder within five (5) business days after notice that the same has not been paid when due; said five (5) business day period shall be in lieu of, and not in addition to, the notice requirements of Section 1161 of the California Code of Civil Procedure or any similar or successor law; (b) Except as set forth in items (a) above and (c) through and including (f) below, failure to perform or observe any other covenant or condition of this Lease to be performed or observed within thirty (30) days following written notice to Tenant of such failure; provided, however, that if the specific default cannot reasonably be cured within such thirty (30) day period, then Tenant shall not be in Default if it commences (in a meaningful way) to cure such default as soon as reasonably possible (but in no event more than thirty (30) days) following receipt of notice of such default, and uses reasonable diligence and good faith efforts to cure such default promptly thereafter.  Such thirty (30) day notice shall be in lieu of, and not in addition to, any required under Section 1161 of the California Code of Civil Procedure or any similar or successor law;

(c)  Tenant's failure to observe or perform according to the provisions of Paragraph 14 above or Paragraph 27 below within five (5) business days after Tenant receipt of a second notice from Landlord (the "Second Notice"), which Second Notice shall specify the action required of Tenant and shall state, "THIS IS A SECOND NOTICE.  YOUR FAILURE TO RESPOND TO THIS SECOND NOTICE WITHIN FIVE (5) BUSINESS DAYS AFTER YOUR RECEIPT OF THIS SECOND NOTICE WILL CONSTITUE A DEFAULT UNDER THE LEASE";

(d)  Any assignment or subletting in violation of Paragraph 12 above;

(e)  Tenant's failure to comply with the provisions of Paragraph 23.4 below within three (3) business days following written notice to Tenant of such failure; or

(f)  A violation of any of the Rules and Regulations attached to this Lease as **Exhibit "D"** or otherwise promulgated pursuant to Paragraph 32.9 below if either: (A) such violation is not cured within ten (10) days from written notice to Tenant of such violation, or (B) any particular violation occurs more than once in any six month period.

19.2  Upon the occurrence of a Default by Tenant, Landlord shall have the following rights and remedies in addition to all other rights and remedies available to Landlord at law or in equity:

19.2.1  The rights and remedies provided by California Civil Code Section 1951.2 including, but not limited to, the right to terminate Tenant's right to possession of the Premises and to recover the worth at the time of award of the amount by which the unpaid Rent and Additional Charges for the balance of the Term after the time of award exceed the amount of rental loss for the same period that Tenant proves could be reasonably avoided, as computed pursuant to Subsection (b) of said Section 1951.2.

19.2.2  The rights and remedies provided by California Civil Code Section 1951.4 which allows Landlord to continue this Lease in effect and to enforce all of its rights and remedies under this Lease including the right to recover Rent and Additional Charges as they become due, for as long as Landlord does not terminate Tenant's right to possession; provided, however, if Landlord elects to exercise its remedies described in this Subsection 19.2.2 and Landlord does not terminate this Lease, and if Tenant requests Landlord's consent to an Assignment of this Lease or a Sublease of the Premises at such time as Tenant is in Default, Landlord shall not unreasonably withhold its consent to such Assignment or Sublease.  Acts of maintenance or preservation, efforts to release the Premises or the appointment of a receiver upon Landlord's initiative to protect its interest under this Lease shall not constitute a termination of Tenant's right to possession.

19.2.3  The right to terminate this Lease by giving notice to Tenant in accordance with applicable law.

19.2.4  The right and power to terminate Tenant's right to possession of the Premises, to enter the Premises and remove there from all persons and Tenant's personal property, and store the same elsewhere at the cost of and for the account of Tenant, and to sell such property and apply the proceeds there from pursuant to applicable California law.  In such event, Landlord will use commercially reasonable efforts sublet the Premises or any part thereof for such term or terms (which may extend beyond the Term) and at such rent and such other terms as Landlord in its reasonable discretion may deem advisable, with the right to make alterations in and repairs to the Premises.  Upon each such subletting, (i) Tenant shall be immediately liable for payment to Landlord of, in addition to indebtedness other than Rent and Additional Charges due hereunder, the cost of such subletting and such alterations and repairs incurred by Landlord and the amount, if any, by which the amount of rent received from such sublet (to the extent such period does not exceed the Term) is less than the amount to be paid as Rent and Additional Charges for the Premises for such period, or (ii) at the option of Landlord, rents received from such subletting shall be applied, first, to the payment of any indebtedness other than Rent and Additional Charges for the Premises due hereunder from Tenant to Landlord; second, to the payment of any costs of such subletting and of such

19

alterations and repairs; third, to the payment of Rent and Additional Charges due and unpaid hereunder; and the residue, if any, shall be held by Landlord and applied to cure any other default in the payment of Rent or Additional Charges.

19.2.5 The right to have a receiver appointed for Tenant, upon application by Landlord, to take possession of the Premises and to apply any rental collected from the Premises and to exercise all other rights and remedies granted to Landlord pursuant to Paragraph 19.2.4

### 20. **Insolvency or Bankruptcy.**

The appointment of a receiver to take possession of all or substantially all of the assets of Tenant, or an assignment by Tenant for the benefit of creditors, or any action taken or suffered by Tenant under any insolvency, bankruptcy, reorganization, moratorium or other debtor relief act or statute, whether now existing or hereafter amended or enacted, shall at Landlord's option constitute a Default by Tenant. Upon the happening of any such event or at any time thereafter, this Lease shall terminate five days after written notice of termination from Landlord to Tenant. In no event shall this Lease be assigned or assignable by operation of law or by voluntary or involuntary bankruptcy proceedings or otherwise.

### 21. **Landlord's Performance of Tenant's Obligations.**

If Tenant shall default in the performance of its obligations under this Lease after any applicable cure period provided herein, Landlord, at any time thereafter upon giving Tenant at least five (5) business days advance written notice (except that no notice shall be required in the case of an emergency), may remedy such default for Tenant's account and at Tenant's expense, without thereby waiving any other rights or remedies of Landlord with respect to such default. Upon demand thereof from Landlord, Tenant shall reimburse Landlord for the reasonable cost to Landlord of performing such obligations plus interest at the maximum rate allowed by law.

### 22. **Indemnification.**

22.1 Subject to the provisions of Paragraph 23.8 below, Tenant agrees to indemnify Landlord against and save Landlord harmless from any and all loss, cost, liability, damage and expense including, without limitation, penalties, fines and reasonable attorney's fees, incurred in connection with or arising from: (i) any default by Tenant in the observance or performance of any of the terms, covenants or conditions of this Lease on Tenant's part to be observed or performed, (ii) the use or occupancy or manner of use or occupancy of the Premises by Tenant or any person claiming through or under Tenant, (iii) the condition of the Premises or any occurrence or happening on the Premises from any cause whatsoever (not due to the gross negligent or willful act or omission of Landlord), or (iv) any act, omission or negligence of Tenant or any person claiming through or under Tenant, or of the employees, suppliers, shippers, customers or invitees of Tenant or any such person, in, on or about the Premises or the Center, whether prior to, during or after the expiration of the Term including, without limitation, any act, omission or negligence in the making or performing of any Alterations. Subject to the provisions of Paragraph 23.8 below, Tenant further agrees to indemnify Landlord, Landlord's agents and the lessor or lessors under all ground or underlying leases against, and hold them harmless from any and all loss, cost, liability, damage and expense including, without limitation, reasonable counsel fees, incurred in connection with or arising from any claims by any persons by reason of injury to persons or damage to property occasioned by any use, occupancy, condition, occurrence, happening, act, omission or negligence referred to in the preceding sentence. Notwithstanding the foregoing, the foregoing indemnity obligations of Tenant shall not apply to the extent of matters arising from (a) Landlord's sole negligence or Landlord's willful misconduct, or (b) the presence of any Hazardous Materials in, on or about the Premises except to the extent of Tenant's obligations under Paragraph 13.2 above.

22.2 Except in the event of the negligence or willful misconduct of Landlord, its agents, employees and/or representatives, Landlord shall not be responsible for or liable to Tenant for any loss or damage that may be occasioned by or through the acts or omissions of persons occupying adjoining premises or any part of the premises adjacent to or connected with the Premises or any part of the Center or for any loss or damage resulting to Tenant or its property from burst, stopped or leaking water, gas, sewer or steam pipes or for any damage to or loss of property within the Premises from any causes whatsoever, including theft.

22.3 Except as specifically provided to the contrary in this Lease, Tenant shall pay to Landlord within thirty (30) days after delivery by Landlord to Tenant of bills or statements thereof: (i) sums equal to all expenditures made and monetary obligations incurred by Landlord including, without limitation, expenditures made and obligations incurred for reasonable counsel fees, in connection with the remedying by Landlord for Tenant's account pursuant to the provisions of Paragraph 21, (ii) sums equal to all losses, costs, liabilities, damages and expenses referred to in Paragraph 22.1, (iii) sums equal to all expenditures made and monetary expenditures made and obligations incurred for reasonable counsel fees, in collecting or attempting to collect the Rent, any Additional Charges or any other sum of money accruing under this Lease, including, but not limited to, Paragraph 32.12 below, and (iv) all other sums of money (other than Rent) accruing from Tenant to Landlord under the provisions of this Lease. Any sum of money (other than Rent) accruing from Tenant to Landlord pursuant to any provision of this Lease including, without limitation, the provisions of the **Exhibit "C"** attached hereto, whether prior to or after the Commencement Date, may, at Landlord's option, be deemed Additional Charges. Tenant's obligations under this Paragraph 22.3 shall survive the expiration or sooner termination of the Term.

22.4  Except to the extent of negligence or willful misconduct of Tenant or its officers, employees, agents, contractors, shippers, suppliers, vendors, customers, licensees or invitees, and subject to the waivers contained in Paragraph 22.2 above, Landlord agrees to indemnify, defend and hold harmless Tenant and its agents, invitees, members, partners, shareholders, officers, directors, employees and contractors, from and against any and all losses, liabilities, claims, damages, costs and expenses (including reasonable attorneys' fees and costs actually incurred) resulting or arising from claims by third parties for injuries to any person and damage to property occurring in the Common Areas to the extent the Common Areas are within Landlord's reasonable control.

23.  **Insurance**.

23.1  **Tenant's Insurance**.  Tenant agrees to maintain in full force and effect at all times during the Term, at its own expense, for the protection of Tenant and Landlord, as their interests may appear, policies of insurance issued by a carrier or carriers meeting the requirements of Paragraph 23.6 below which afford the following coverages with a maximum deductible amount of $25,000:  (i) worker's compensation: statutory limits; (ii) employer's liability: as required by law; (iii) commercial general liability insurance, including blanket contractual liability, broad form property damage, personal injury, completed operations and products liability, with a combined single limit for both bodily injury and property damage of not less than $2,000,000 ($1,000,000 of which may be insured through Tenant's excess liability coverage), and naming Landlord and Landlord's mortgagees as additional insured by separate endorsement to Tenant's policy (which may be by endorsement to Tenant's umbrella coverage); and (iv) standard fire and extended coverage insurance, with vandalism and malicious mischief endorsements on all Tenant's personal property, Tenant Improvements and Alterations to the extent of their full replacement cost; the proceeds from any such policy shall be used by Tenant for, as applicable, (A) replacement of Tenant's personal property if deemed appropriate by Tenant, and/or (B) the restoration of Tenant Improvements or Alterations.

23.2  **Property Insurance**.  Landlord shall obtain property insurance.  Landlord shall not be required to name Tenant as an additional insured under any such policy.  Tenant shall pay, as a Common Expense, Tenant's Share of the cost of all insurance so obtained.  Landlord shall obtain and keep in force during the Term of this Lease a policy or policies of insurance in an amount equal to the full replacement cost (inclusive of excavations, footings and foundations) of improvements, including the Premises, except with respect to earthquake coverage.  Such policy or policies shall include loss or damage to the Premises against all perils included within the classification of fire, extended coverage, vandalism, malicious mischief, and special extended perils ("special causes of loss" as such term is used in the insurance industry), (and may include flood and earthquake coverage, but only if required by Landlord's lender).  Said insurance shall provide for payment of loss thereunder to Landlord or to the holders of mortgages or deeds of trust on the Premises.  Landlord shall, in addition, obtain and keep in force during the Term of this Lease a policy of loss of rent insurance covering a period of one year, with loss payable to Landlord.  If the Premises are part of a larger building, or if the Premises are part of a group of buildings owned by Landlord which are adjacent to the Premises, then Tenant shall pay for any increase in the property insurance of such other building or buildings if said increase is caused by Tenant's acts, omissions, use or occupancy of the Premises.  If the Premises are not insured separately, then Landlord shall equitably apportion the cost of such insurance based upon the ratio of the square footage of the Building to the square footage of all buildings in the Center.  Tenant shall pay the amount of the cost of such insurance as apportioned to the Premises.  Landlord will not insure Tenant's fixtures, equipment or Tenant Improvements, the insurance for which shall be obtained by Tenant, at its sole cost and expense.

23.3  **Deductibles**.  Tenant shall be solely responsible for the payment of Tenant's Share of any deductible under any policy of insurance under this Lease.

23.4  **Certificates**.  Tenant shall deliver to Landlord at least three (3) business days prior to the time such insurance is first required to be carried by Tenant, and thereafter at least three (3) business days prior to expiration of each such policy, certificates of insurance (or binders therefor if certificates are not then available, provided that certificates are sent to Landlord when available) evidencing the coverage required by Paragraph 23.1 above, with limits not less than those specified therein.  The certificates of insurance shall expressly provide that the insurers will endeavor to provide Landlord with fifteen (15) days advance notice of policy cancellation or non-renewal.  Tenant shall also deliver to Landlord, within 10 days after written request, a copy of the insurance policy or policies issued pursuant to the certificates of insurance or binders therefor, as applicable.

23.5  **Sufficiency of Coverage**.  Neither Landlord nor Landlord's agents makes any representation that the limits of liability specified to be carried by Tenant under this Lease are adequate to protect Tenant.  If Tenant believes that any such insurance coverage is insufficient, Tenant shall provide, at its own expense, such additional insurance as Tenant deems adequate.

23.6  **Tenant's Insurance Requirements**.  All insurance required to be provided by Tenant hereunder shall be carried with companies that have a general policyholder's rating of not less than "A" and a financial rating of not less than Class "VII" in the most current edition of Best's Insurance Reports.  The policy or policies, or certificates of insurance, shall be deposited with Landlord prior to the Commencement Date, and upon renewal of such policies not less than three (3) business days prior to the expiration of the term of such coverage. Additionally, Tenant's insurance shall not be invalidated with respect to the interest of Landlord therein by reason of any breach or violation by Tenant of any warranties, representations,

declarations or conditions contained in the policies.

23.7 **Failure to Pay.** The failure of Tenant to obtain and pay for any insurance required to be obtained and paid for by it hereunder shall constitute a "Default" under this Lease.

23.8 **Waiver of Subrogation.** Landlord and Tenant each hereby waive all rights of recovery against the other on account of loss and damage occasioned to such waiving party for its property or the property of others under its control to the extent that such loss or damage is insured against under any insurance policies in force at the time of such loss or damage. Tenant and Landlord shall, upon obtaining policies of insurance required hereunder, give notice to the insurance carrier that the foregoing mutual waiver of subrogation is contained in this Lease and Tenant and Landlord shall cause each insurance policy obtained by such party to provide that the insurance company waives all right of recovery by way of subrogation against either Landlord or Tenant in connection with any damage covered by such policy.

23.9 Self-Insurance. Notwithstanding anything to the contrary contained herein, subject to the terms hereof, Tenant shall have the right to self-insure part or all or any of the insurance coverages required to be maintained by Tenant under this Paragraph 23 so long as (i) Tenant maintains a tangible net worth at least equal to One Hundred Million and No/100ths Dollars ($100,000,000.00), determined in accordance with GAAP, according to the most recent consolidated financial statement referred to below and certified by Tenant's certified public accountant, and (ii) Tenant delivers a copy of said certified financial statement to Landlord prior to self-insuring for the coverages required hereunder. If Tenant elects to self-insure, Tenant shall be responsible for any losses or liabilities that would have been assumed by the insurance companies which would have issued the insurance required of Tenant under this Lease (including any claim for which Landlord would have been covered as an "additional insured") and shall be bound by the waiver of subrogation provision set forth above in Paragraph 23.8. In the event that Tenant elects to self-insure all or any part of any risk that would be insured under the policies and limits described above, and an event occurs where insurance proceeds would have been available but for the election to self-insure, Tenant shall make funds available to the same extent that they would have been available had such insurance policy been carried, unless specifically provided to the contrary herein.

24. **Access to Premises**. Landlord reserves and shall at all times have the right, to enter the Premises at all reasonable times and upon reasonable advance notice to Tenant (except that no advance notice shall be required in the case of an emergency) to (i) inspect same, (ii) supply any service to be provided by Landlord to Tenant hereunder, (iii) show the Premises to prospective purchasers, mortgagees or tenants, (iv) post notices of non-responsibility and to alter, improve or repair the Premises and any portion of the Center without abatement of Rent or Additional Charges, and may for that purpose erect, use and maintain scaffolding, pipes, conduits and other necessary structures in and through the Premises where reasonably required by the character of the work to be performed, provided that the entrance to the Premises shall not be blocked thereby, and further provided that the business of Tenant shall not be interfered with unreasonably. Tenant hereby waives any claim for damages for any injury or inconvenience to or interference with Tenant's business, any loss of occupancy or quiet enjoyment of the Premises or any other loss occasioned by the exercise of Landlord's right of entry. For each of the aforesaid purposes, Landlord shall at all times have and retain a key with which to unlock all doors in, upon and about the Premises excluding Tenant's files, vaults, and safes or special security areas (designated in advance), and Landlord shall have the right to use any and all means that Landlord may deem necessary or proper to open said doors in an emergency, in order to obtain entry to any portion of the Premises, and any entry to the Premises or portions thereof obtained by Landlord by any of said means or otherwise shall not under any circumstances be construed or deemed to be a forcible or unlawful entry into, or a detainer of, the Premises or an eviction, actual or constructive, of Tenant from the Premises or any portion thereof.

25. **Notices.** Except as otherwise expressly provided in this Lease, any bills, statements, notices, demands, requests or other communications given or required to be given under this Lease shall be effective only if rendered or given in writing, sent by registered or certified mail or delivered personally, sent via overnight courier sent or by facsimile transmission (provided, in the case of facsimile transmission, notice is also sent by a reputable national overnight courier service) to the parties at their addresses set forth below:

If to Tenant:   P&P Hardware, Inc.
                30733 Temecula Parkway
                Temecula, CA 92592

                Attention: Paul Douglas Shanabarger
                Facsimile: **951 491 – 6094**

If to Landlord:   Falcon Business Park, LLC
                  4 Upper Newport Plaza, Suite 100
                  Newport Beach, CA 92660
                  Facsimile: (949) 833-5401

or to such other address as either Landlord or Tenant may designate as its new address for such purpose by notice given to the other in accordance with the provisions of this Paragraph 25.

Any such bill, statement, notice, demand, request or other communication shall be deemed to have been rendered or given three business days after the date when it shall have been mailed as provided in this Paragraph 25 if sent by registered or certified mail, or upon the date personal delivery or delivery by

overnight courier is made, or, if sent by facsimile transmission, shall be to have been rendered at the time of delivery indicated on the electronic confirmation of the facsimile (provided, in the case of a facsimile transmission, notice is also sent by a reputable national overnight courier service). If Tenant is notified of the identity and address of Landlord's mortgagee or ground or underlying lessor, the terms of this Lease in writing sent by registered or certified mail, and such mortgagee or ground or underlying lessor shall be given a reasonable opportunity to cure such default prior to Tenant's exercising any remedy available to it.

26. <u>**No Waiver by Landlord.**</u>

26.1   No failure by Landlord to insist upon the strict performance of any obligation of Tenant under this Lease or to exercise any right, power or remedy consequent upon a breach thereof, no acceptance of full or partial Rent or Additional Charges during the continuance of any such breach, and no acceptance of the keys to or possession of the Premises prior to the termination of the Term by any employee of Landlord shall constitute a waiver of any such breach or of such term, covenant or condition or operate as a surrender of this Lease.   No payment by Tenant or receipt by Landlord of a lesser amount than the aggregate of all Rent and Additional Charges then due under this Lease shall be deemed to be other than on account of the first items of such Rent and Additional Charges then accruing or becoming due unless Landlord elects otherwise; and no endorsement or statement on any check, no letter accompanying any check or other payment of Rent or Additional Charges in any such lesser amount and no acceptance of any such check or other such payment by Landlord shall constitute an accord and satisfaction, and Landlord may accept such check or payment without prejudice to Landlord's right to recover the balance of such Rent or Additional Charges or to pursue any other legal remedy.

26.2   Neither this Lease nor any term or provision hereof may be changed, waived, discharged or terminated orally, and no breach thereof shall be waived, altered or modified except by a written instrument signed by the party against which the enforcement of the change, waiver, discharge or termination is sought.   No waiver of any breach shall affect or alter this Lease, but each and every term, covenant and condition of this Lease shall continue in full force and effect with respect to any other then existing or subsequent breach thereof.

27. <u>**Tenant's Certificates**</u>.   Tenant, at any time and from time to time upon not less than ten day's prior written notice from Landlord, will execute, acknowledge and deliver to Landlord and, at Landlord's request, to any prospective purchaser, ground or underlying lessor or mortgagee of any part of the Center, a certificate of Tenant stating:   (i) that Tenant has accepted the Premises (or, if Tenant has not done so, that Tenant has not accepted the Premises and specifying the reasons thereof), (ii) the Commencement and Expiration Dates of this Lease; (iii) and that this Lease is unmodified and in full force and effect (or, if there have been modifications, that same is in full force and effect as modified and stating the modifications), (iv) whether or not there are then existing any defenses against the enforcement of any of the obligations of Tenant under this Lease (and, if so, specifying same), (v) whether or not there are then existing any defaults by Landlord in the performance of its obligations under this Lease (and, if so specifying same), (vi) any other information that may reasonably be required by any of such persons.   It is intended that any such certificate of Tenant delivered pursuant to this Paragraph 27 may be relied upon by Landlord and any prospective purchaser, ground or underlying lessor or mortgagee of any part of the Center.

28. <u>**Tax on Tenant's Personal Property**</u>.   At least ten days prior to delinquency Tenant shall pay all taxes levied or assessed upon Tenant's equipment, furniture, fixtures and other personal property, located in or about the Premises.   If the assessed value of Landlord's property is increased by the inclusion therein of a value placed upon Tenant's equipment, furniture, fixtures or other personal property, Tenant shall pay to Landlord, within thirty (30) days of written demand, the taxes so levied against Landlord or the proportion thereof resulting from said increase in assessment.   The portion of real estate taxes payable by Tenant pursuant to this Paragraph 28 and by other tenants of the Center pursuant to similar provisions in their leases shall be excluded from Taxes for purposes of computing the Additional Charges to be paid pursuant to Paragraph 4.

29. <u>**Security Deposit**</u>.   Upon execution and delivery to Landlord of this Lease, Tenant shall deliver to Landlord security deposit set forth in Paragraph 17 of the Basic Lease Information as a security deposit for the faithful performance of all terms, covenants and conditions of this Lease.   Tenant agrees that Landlord may, without waiving any of Landlord's other rights and remedies under this Lease upon the occurrence of any of the events of Default described in Paragraph 19, apply the security deposit to remedy any failure by Tenant to repair or maintain the Premises or to perform any other terms, covenants or conditions contained herein.   If Tenant has kept and performed all terms, covenants and conditions of this Lease during the Term, Landlord will, within 30 days following the termination hereof, return said sum to Tenant or the last permitted assignee of Tenant's interest hereunder at the expiration of the Term.   Should Landlord use any portion of the security deposit to cure any Default by Tenant hereunder, Tenant shall forthwith replenish the security deposit to the original amount.   Landlord shall not be required to keep the security deposit separate from its general funds and Tenant shall not be entitled to interest on any such deposit.   Upon the occurrence of any of the events of Default described in Paragraph 19, the security deposit shall become due and payable to Landlord to the extent required to compensate Landlord for damages incurred, or to reimburse Landlord as provided herein, in connection with any such event of Default.

30. <u>**Authority**</u>.   If Tenant signs as a corporation, partnership, trust, limited liability company, or any other legal entity, each of the persons executing this Lease on behalf of Tenant does hereby covenant and warrant

that Tenant is a duly authorized and existing entity, that Tenant has and is qualified to do business in California, that Tenant has full right and authority to enter into this Lease and that such person signing on behalf of Tenant is authorized to do so. Upon Landlord's request, Tenant shall provide Landlord with evidence reasonably satisfactory to Landlord confirming the foregoing covenants and warranties.

31. **Commissions.**  With the exception of (a) a real estate commission which Landlord intends to pay to Landlord's Broker, as specified in Basic Lease Information Paragraph 18, pursuant to a separate agreement between Landlord and Landlord's Broker, and (b) a cooperating broker's real estate commission payable to Tenant's Broker, if any is specified in Basic Lease Information Paragraph 18, by Landlord's Broker, pursuant to a separate written agreement between Landlord's Broker and Tenant's Broker, each party represents to the other that it has not entered into any agreements regarding the payment of, and has no knowledge of, any obligation to pay, a real estate broker's commission, finder's fee or any other compensation regarding this Lease or the Premises. Each party agrees to hold the other party harmless from any claim or liability, including reasonable attorneys' fees, in connection with any claim for a real estate broker's commission, finder's fee or other compensation incurred by or through the indemnifying party.  Landlord specifically disclaims any responsibility for the payment of any commission payable to Tenant's Broker or any party other than Landlord's Broker.  This Agreement is not intended to be, nor shall it be construed as, a third party beneficiary contract in favor of Landlord's Broker, Tenant's Broker, if any, or any other party making a claim for a real estate broker's commission, finder's fee or other compensation.

32. **Miscellaneous.**

32.1  The words "Landlord" and "Tenant" as used herein shall include the plural as well as the singular.  The words used in the neuter gender include the masculine and feminine.  If there is more than one Tenant, the obligations under this Lease imposed on Tenant shall be joint and several.  The captions preceding the paragraphs of this Lease have been inserted solely as a matter of convenience, and such captions in no way define or limit the scope or intent of any provision of this Lease.

32.2  The terms, covenants and conditions contained in this Lease shall bind and inure to the benefit of Landlord and Tenant and, except as otherwise provided herein, their respective personal representatives and successors and assigns; provided, however, upon the sale, assignment or transfer by Landlord as named herein (or by any subsequent landlord) of its interest in the Building as owner or lessee, including any transfer by  operation of law, Landlord (or subsequent landlord) shall be relieved of all subsequent obligations or liabilities under this Lease, and all obligations subsequent to such sale, assignment or transfer (but not any obligations or liabilities that have accrued prior to the date of such sale, assignment or transfer) shall be binding upon the grantee, assignee or other transferee of such interests, and any such grantee, assignee or transferee, by accepting such interest, shall be deemed to have assumed such subsequent obligations and liabilities.  A lease of the entire Building to a person other than for occupancy thereof shall be deemed a transfer within the meaning of this Paragraph 32.2.

32.3  If any provision of this Lease or the application thereof to any person or circumstance shall, to any extent, be invalid or unenforceable, the remainder of this Lease, or the application of such provision to persons or circumstances other than those as to which it is invalid or unenforceable, shall not be affected thereby, and each provision of this Lease shall be valid and be enforced to the full extent permitted by law.

32.4  This Lease shall be construed and enforced in accordance with the laws of the State of California.

32.5  Submission of this instrument for examination or signature by Tenant does not constitute a reservation of or an option for lease.  This instrument is not effective as a lease or otherwise until execution and delivery by both Tenant and Landlord.

32.6  This instrument, including any addendum and exhibits hereto which are made a part of this Lease, contains the entire agreement between the parties, and all prior negotiations and agreements are merged herein.  Neither Landlord nor Landlord's agents have made any representations or warranties with respect to the Premises, the Building, the Center or this Lease except as expressly set forth herein, and no rights, easements or licenses are or shall be acquired by Tenant by implication or otherwise unless expressly set forth herein.

32.7  The review, approval, inspection  or examination by Landlord of any item to be reviewed, approved, inspected or examined by Landlord under the terms of this Lease, any addendum or the exhibits attached hereto shall not constitute the assumption of any responsibility by Landlord for either the accuracy or sufficiency of such item or the quality or suitability of such item for its intended use.  Any such review, approval, inspection or examination by Landlord is for the sole purpose of protecting Landlord's interests in the Center and under this Lease, and no third parties including, without limitation, Tenant or any person or entity claiming through or under Tenant, or the contractors, agents, servants, employees, visitors or licensees of Tenant or any such person or entity, shall have any rights hereunder.

32.8  Tenant shall not place any  sign upon the Premises, the Building or the Center without Landlord's prior written consent, which consent  shall not be unreasonably withheld.  The size, design, color and other physical aspects of the permitted Tenant identification sign (collectively "Sign Criteria") and general requirements relating thereto are set forth on **Exhibit "E-1"** attached hereto, and shall be subject to (i) any covenants, conditions or restrictions encumbering the Center, and (ii) any applicable municipal or other governmental permits and approvals.  Under no circumstances shall Tenant place a sign on any roof of the Center.

24

32.9   The Rules and Regulations attached to this Lease as **Exhibit "D"** are made a part of this Lease, and Tenant shall comply with such rules and regulations. Landlord shall have the right from time to time to promulgate amendments and additional rules and regulations for the safety, care and cleanliness of the Premises, the Building, Common Area and the Center, or for the preservation of good order. Upon delivery of a copy of such amendments and additional rules and regulations to Tenant, Tenant shall comply with such amendment or additional rules and regulations. If there is a conflict between the rules and regulations and any other provisions of this Lease, the provisions of this Lease shall prevail. Landlord shall make all reasonable efforts to enforce the rules and regulations uniformly against all tenants in the Center, and no such rules and regulations shall require Tenant to pay Additional Charges under this Lease.

32.10   Tenant hereby acknowledges that Landlord shall have no obligation whatsoever to provide guard services or other security measures for the benefit of the Premises or the Center. Tenant assumes all responsibility for the protection of Tenant, its employees, supplier, shippers, customers and invitees and the property of Tenant and of Tenant's employees, supplier, shippers, customers and invitees from acts of third parties. Nothing herein contained shall prevent Landlord, at Landlord's sole option, from providing security protection for the Center or any part thereof, in which event the cost thereof shall be included within the definition of Common Expenses, as set forth in paragraph 4.1.4.

32.11   Landlord reserves the right, from time to time, to grant such easements, rights and dedications as Landlord deems necessary or desirable and to cause the recordation of parcel maps and restriction as long as such easements, rights, dedication, maps and restrictions do not unreasonably interfere with the use of the Premises by Tenant. At Landlord's request, Tenant shall join in the execution of any of the aforementioned documents.

32.12   In the event that either Landlord or Tenant fails to perform any of its obligations under this Lease or in the event a dispute arises concerning the meaning or interpretation of any provision of this Lease, the defaulting party or the party not prevailing in such dispute, as the case may be, shall pay any and all costs and expenses incurred by the other party in enforcing or establishing its rights hereunder including, without limitation, court costs and reasonable attorney's fees, including but not limited to those incurred in connection with appellate or bankruptcy proceedings.

32.13   Upon the expiration or sooner termination of the Term, Tenant will quietly and peacefully surrender to Landlord the Premises in the condition in which they are required to be kept as provided in Paragraph 9, ordinary wear and tear and the provisions of Paragraph 16 excepted.

32.14   Upon Tenant's paying the Rent and Additional Charges and performing all of Tenants obligations under this Lease, Tenant may peacefully and quietly enjoy the Premises during the Term as against all persons or entities lawfully claiming by or through Landlord; subject, however, to the provisions of this Lease and to any mortgages or ground or underlying leases referred to in Paragraph 14.

32.15   Any holding over after the expiration of the Term with the consent of Landlord shall be construed to be a tenancy from month-to-month at 150% of the Monthly Rent herein specified (prorated on a monthly basis), unless Landlord shall specify a different rent in its sole discretion, together with an amount estimated by Landlord for the monthly Additional Charges payable under this Lease, and shall otherwise be on the terms and conditions herein specified as far as applicable. Any holding over without Landlord's consent shall constitute a "Default" by Tenant and shall entitle Landlord to reenter the Premises as provided in Paragraph 19 above, to recover Monthly Rent for the period of such holding over at 150% of the Monthly Rent herein specified, and to exercise all other rights and remedies of Landlord in the event of a Default under this Lease.

32.16   [Intentionally Omitted]

32.17   In the event that either party hereto shall be delayed or hindered in or prevented from the performance of any act required hereunder by reason of strikes, lock-outs, inability to procure labor, inability to procure materials, failure of power, governmental moratorium, riots, insurrection, war or other reason of a like nature not the fault of the party delaying in performing work or doing acts required under the terms of this Lease, then performance of such act shall be excused for the period of delay and the period for the performance of any such act shall be extended for a period of such delay.

32.18   In the event that there is a Guarantor of this Lease, said Guarantor shall have the same obligations as Tenant under this Lease.

IN WITNESS WHEREOF, Landlord and Tenant have executed this Lease the day and year first above written.

**LANDLORD:**

**FALCON BUSINESS PARK LLC,**
a California limited liability company
By:  Falcon BP II LLC,
    a California limited liability company
    Its Sole Member

By:

Donald E. Russell, Managing Member

**TENANT:**

**P&P HARDWARE, INC.**
a California corporation

By:
Name: Paul Douglas Shanabarger
Its: _____ CEO

26

0032

**EXHIBIT "A"**

LEGAL DESCRIPTION OF THE CENTER

LOT 9 OF TRACT NO. 30857-1, AS SHOWN BY MAP ON FILE IN BOOK 371 PAGES 28 THROUGH 38, INCLUSIVE, OF MAPS, RECORDS OF RIVERSIDE COUNTY CALIFORNIA.

0033

| **EXHIBIT "B-1"**<br>**Depiction of the Center** |
| --- |

## SITE PLAN



Premises

Premises:
14529 Innovation Drive, Suite B
Riverside, California 92518

0034

**EXHIBIT "B-2"**
**Premises Floor Plan**

Premises:
14529 Innovation Drive, Suite B
Riverside, California 92518

(Drawing not to scale)



0035

### EXHIBIT "C"

#### LANDLORD IMPROVEMENTS

Landlord at Landlord's expense shall complete the following improvements, as detailed further in Exhibit "C-1".

Offices
1. Removal of all flooring, to be replaced with carpeting (see exhibit) except in break room where tile is to be used. Carpet is also to be replaced in Office adjacent to Server Room.
2. Sewing/Embroidery Machine Area flooring to be left as exposed concrete.
3. Removal of reception counter.
4. Construction of two walls in the office area to create sewing room per exhibit. Sound damping/proofing materials should be used to insulate office space from machine area.
5. Installation of one wet bar/coffee area in the reception area (to utilize existing plumbing)
6. All walls to be primed & painted in an off-white color.

Showroom
1. Removal of all flooring, to be left as exposed concrete.
2. Removal of triangular rooms in the showroom area (per exhibit).
3. Removal of exposed plumbing in the showroom area.
4. Construction of a full height demising wall separating the showroom and warehouse per attached exhibit.
5. Installation of standard warehouse lighting in showroom and warehouse areas. (T-5 or equivalent)
6. Installation of two warehouse doors (per exhibit) to allow for pallet / merchandise transport between Showroom and Warehouse spaces without loss of climate control.
7. Removal of "archway" wall entering into showroom area from the reception area (see exhibit).
8. Drywall fill of wall area by the restrooms (see exhibit).
9. All walls to be primed and painted off-white from floor to gray/black portion near ceiling.

Warehouse
1. Creation of a warehouse area, to include removal of drop ceiling area per attached exhibit.
2. Removal of false wall at the current ground level door.
3. Installation of standard warehouse lighting in showroom and warehouse areas. (T-5 or equivalent)

All other systems, as-is, where-is.  All other improvements shall be at the sole cost of Tenant.

LANDLORD:                                                          TENANT:

_____                        _____
(Initials)                                                              (Initials)

#### TENANT IMPROVEMENTS

Tenant, at Tenant's sole expense, shall be allowed to complete the following improvements in accordance with Article 7 of the Lease, as detailed further in Exhibit "C-1".

Office
1.    Move existing Breakroom counters and plumbing from existing Breakroom into adjacent new Breakroom.
2.    Install window in Office overlooking entrance.
3.    Install electrical and computer cabling for Sewing / Embroidery Machine Area.
4.    Install necessary cabling and electrical for cash registers and computers at entrance and in office space.

Showroom
1.    Application of concrete stain to the showroom floor.
2.    Installation of accent and area specific lighting.
3.    Installation of cased opening for "Will Call" area (per exhibit).

LANDLORD:                                                          TENANT:

_____                        _____
(Initials)                                                              (Initials)

**EXHIBIT "C-1"**

**Exhibit to Landlord and Tenant Improvements**
(drawings are not to scale)

Tenant's Improvements:

Landlord's Improvements:





Not all improvements are depicted
on the above floor plan.
Please refer to Exhibit "C" for
detail on improvements.

This vestibule is required
for SCE access and
cannot be removed

31

**EXHIBIT "D"**

**RULES AND REGULATIONS**

<u>General Rules</u>

1.          Tenant shall not suffer or permit the obstruction of any Common Areas, including, but not limited to, driveways, sidewalks, walkways, and entrances.

2.          Tenant shall not suffer or permit loitering in any part of the Project.

3.          Tenant shall not make or permit any noises, vibrations, or odors that unreasonably annoy or interfere in any way with other tenants or persons having business within the Project.

4.          No animals or birds shall be kept within the Project.

5.          Tenant shall not bring bicycles, motorcycles or other vehicles into areas not designated as authorized for same.

6.          Landlord reserves the right to exclude or expel from the Project any person who Landlord in good faith judges to be intoxicated or under the influence of liquor or drugs or who shall in any manner do any act in violation of the rules and regulations of the Project.

7.          Landlord reserves the right to refuse access to any person or persons Landlord in good faith judges to be a threat to the safety, reputation or property of the Project and its occupants.

8.          Tenant shall be responsible for the inappropriate use of bathrooms, plumbing or other utilities.  No foreign substances, rubbish, trash, newspapers or cleaning substances of any kind are to be inserted therein.

9.          Tenant shall not suffer or permit the washing of automobiles, trucks, equipment or other vehicles in any part of the Project.

10.          Tenant shall not suffer or permit the washing down of painting materials or other matter which will stain the pavement or leave permanent markings within the Project.  Any such damage shall be repaired at Tenant's sole cost and expense.

11.          Tenant shall deposit all trash and debris in receptacles provided within the Project and all bins shall remain inside enclosed trash areas as provided.  If necessary, large quantities or certain types of disposable materials such as packing boxes, pallets or containers, may be stored outside the Building against an exterior wall next to the overhead door on the day scheduled for special refuse pickup of these materials only.  At all other times, disposable trash and debris is to be stored inside the Building unless it can be broken down and placed in a trash receptacle.

12.          Tenant shall not suffer or permit outside work activity or storage of any kind outside the Building.  All paved areas, including parking spaces, driveways and alleys are to be kept clean and clear at all times except for legitimate parking of vehicles as allowed by the Lease or for temporary loading or unloading as necessary.

13.          All keys shall be obtained from Landlord.  Lessee shall return all keys to Landlord at the termination of this Lease.  Lessee shall be responsible for the cost of replacing any keys that are lost.  Lessee shall not change the locks or install other locks on the doors without Landlord's prior approval and shall provide Landlord with a master key.

14.          No part of the Project, the Building or the Premises shall be used for residential purposes.

## Parking Rules

1.      Tenant shall not permit or allow any vehicle that either belongs to, or is controlled by, Tenant or Tenant's employees, suppliers, shippers, customers or invitees to be loaded, unloaded or parked in areas other than those designated by Landlord for such activities.

2.      Users of the parking area will obey all posted signs and park only in the areas designated for vehicle parking.

3.      Unless otherwise instructed, each person using the parking area is required to park and lock his own vehicle. Landlord will not be responsible for any damage to vehicles, injury to persons or loss of property, all of which risks are assumed by the party using the parking area.

4.      Validation, if established, will be permissible only by such method or methods as Landlord and/or its licensee may establish at rates generally applicable to visitor parking.

5.      The maintenance, washing, waxing or cleaning of vehicles in the Common Area is prohibited.

6.      Tenant shall be responsible for seeing that all of its employees, agents and invitees comply with the applicable parking rules, regulations, laws and agreements.

7.      Parking shall be limited to (i) unassigned parking stalls within area designated pursuant to attached Parking Exhibit "D-1" and (ii) within the loading dock area of the Premises depicted in Exhibit B-1.

LANDLORD:

_____
(Initials)

TENANT:

_____
(Initials)

33

EXHIBIT "D-1"
PARKING EXHIBIT



Shaded Area is
designated parking for
14529 Innovation Drive,
Riverside, CA

34

**EXHIBIT "E"**
**SIGN CRITERIA**

This sign criteria, attached as Exhibit "E-1" Falcon Business Park, Planned Sign Program, dated December 22, 2005, establishes the uniform policies for all Tenant sign identification.  This sign criteria has been established for the purpose of maintaining the overall appearance of the Center. Conformance will be strictly enforced.   Any sign installed that does not conform to the sign criteria will be brought into conformity at the expense of the Tenant.

LANDLORD:

_____
(Initials)

TENANT:

_____
(Initials)

35

0041

**EXHIBIT "E-1"**
**Project Sign Program**



**PLANNED SIGN PROGRAM**

December 22, 2005

**JB3D**
731 N. Main Street
Orange, California 92868
714.744.2300 • jb3d.com

36

TABLE OF CONTENTS

TABLE OF CONTENTS PAGE. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1
SITE PLAN. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1.1
GENERAL SPECIFICATIONS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .2
SIGN DESCRIPTIONS. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3
GENERAL SIGN STANDARDS. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4
MISCELLANEOUS RESTRICTIONS. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5
SIGN TYPE A:  GROUND MOUNTED  PROJECT ID. . . . . . . . . . . . . . . . . . . . . . . . . 6
SIGN TYPE B:  ON-BUILDING BUSINESS I.D. SIGNS . . . . . . . . . . . . . . . . . . . . . . . . 7-10
SIGN TYPE C:  MULTI TENANT ON-BUILDING TENANT ID . . . . . . . . . . . . . . . . . . 11
SIGN TYPE D: NOT USED
SIGN TYPE E:  NO EXHIBIT
SIGN TYPE E:  NO EXHIBIT

Falcon
Business
Park

37

0043



0044

SIGN CRITERIA

Project: Falcon Business Park

Declarant: Operon

## A. General Specifications

1. Purpose
   The purpose of the following criteria is to establish a coordinated sign program that gives each tenant adequate identification, while achieving a unified, attractive appearance among all lease spaces. In order to maintain the integrity of the criteria and equality among all tenants, deviations from the criteria will not generally be approved.

2. Exceptions
   The Declarant and the March JPA Planning Department must approve all exceptions to these criteria.

3. Declarant Approval
   Prior to sign fabrication, the tenant shall submit three (3) copies of drawings of the proposed signs to the Declarant for approval. Such drawings must include all of the items listed below under "City Approval and Permits". One copy of the drawings shall be colored.

4. City Approval and Permits
   Plans required: Upon approval by the Declarant, the tenant shall secure a sign permit from the March JPA Planning Department by submitting three (3) copies fully dimensioned, to scale for its approval:
   a. A site plan showing the location of the lease space on the site.
   b. An elevation of the lease space drawn to scale and showing sign placement and lease space width.
   c. A detailed elevation of the sign drawn to scale and showing all colors, materials, dimensions and copy.
   d. Fabrication and installation details, including structural and engineering data, U.L. electrical specifications, and type and intensity of illumination (for electrical signs).

5. Cost of Permits
   All permits for signs and the installation thereof shall be obtained and paid for by the tenant.

6. Compliance with Code
   All signs and the installation thereof shall comply with all local zoning, building and electrical codes.

7. Maintenance
   All signs within Falcon Business Park shall be maintained in an as-new condition. The

Falcon
Business
Park

Page 2

39

Declarant or its designee shall make periodic inspections of all signs on site. Any deficiencies shall be immediately corrected by the party responsible for said signs.

**B. Sign Descriptions**

Sign Type A: Ground Mounted Project I.D. (See Page 6)
This sign type is provided for ground mounted project identification. Two signs will be permitted within the landscape setback area. This sign type shall conform to the exhibit shown on Page 6. Sign may be up-lit with ground mounted warm white flood lighting. Lighting to be designed so as to not cause glare to motorists. Graphics shall be limited to project name/logo as shown.

Sign Types B: On-Building Business I.D. Signs (See Pages 7,8,9 & 10)
These signs are provided for on-building business identification. This sign type shall occur at the spandrel panel as shown in elevation, but not within 10' of a building address. The copy shall be limited to company name in project or corporate letter style. Wording of signs shall not include the product sold or services offered, except as a part of Tenant's trade name or insignia. Only one sign will be permitted per tenant, per building (except for Two Story/Multi-Tenant Office Building at the declarant's discretion).

The maximum area for this sign type is sixty (30) square feet. Individual letters and logos shall not exceed 24" in height or 15' in overall length for each tenant. Can signs may not exceed a maximum of six (6) square feet. Only one primary sign may occur at a building corner. This sign type may be internally "halo" or face illuminated. Graphics shall be fabricated from non-ferrous metals. Graphics shall be a minimum of 1" thick per 6" graphic height. Colors of graphics will be subject to the approval of the Declarant or its Designee. The exterior pan channel must be black.

Sign Type C: Multi Tenant On-Building I.D. Sign (See Page 11)
These signs are provided for multi tenant on-building business identification. This sign type shall occur at the spandrel panel as shown in elevation, but not within 10' of a building address. This sign type is subject to 18" of free space to the left and right of the sign. The text shall be limited to company name in project type style or corporate letter style. Use of logos is discouraged, but may be approved subject to review by the Declarant or its Designee. Wording of signs shall not include the product sold or services offered, except as a part of Tenant's trade name or insignia. Only one sign will be permitted per tenant.

The maximum area for this sign type is eighteen (18) square feet. Individual letters and logos shall not exceed 18" in height or 12' in overall length for each tenant. Can signs may not exceed a maximum of six (6) square feet. This sign type shall be non-illuminated. Graphics shall be fabricated from non-ferrous metals. Graphics shall be a minimum of 1" thick per 6" graphic height. Colors of graphics will be subject to the approval of the Declarant or its Designee. The exterior pan channel must be black.

Sign Type D: Ground Mounted Project Directional Sign (NOT USED)

Sign Type E: Building Address (No Exhibit)
Each building will have a minimum of one building address. Each set shall be located to aid visitors and emergency personnel. For buildings less than 25' in height, graphics shall

Falcon
Business
Park

Page 3

40

be a minimum of 12" in height and for buildings larger than 25' in height, graphics shall be a minimum of 24" in height. The graphics must black in color. Graphics shall be manufactured from non-ferrous metals.

Sign Type F: I.D. Sign at Office Entry Window Glass (No Exhibit)

Each tenant will be allowed one identification and information sign on their front window adjacent to main entry door. Graphics will be limited to white high performance self-adhesive vinyl. The maximum area for the sign will be a 24" X 24" square. Lettering shall not exceed 4" in height and logos shall not exceed 10" in height. Supportive text shall be limited to 1" tall lettering set flush left. The graphics shall be centered vertically at 60" and must be at least 4" from any edge of glass.

**C. General Sign Standards**

1. Sign area is defined as the entire area within a perimeter defined by a continuous line composed of right angles which enclose the extreme outer limit's of lettering, logo or trademarks together with any frame or structural trim forming a part of the display used to differentiate the sign from the background against which it is placed.

2. The letter style for all ground mounted signs shall be Friz Quadrata as shown.

3. The location of all applicable ground mounted signs shall conform to the March JPA site distance triangle standard.

4. All paint on aluminum or acrylic shall be Matthews Satin acrylic polyurethane over proper primer. The color of all building graphics, other than primary tenant names, shall match project graphic color.

5. Tenant signs attached to the building shall be formed by individual letters and shall be surface mounted. All signs shall be single-line-of-copy signs. Two- line signs may be allowed subject to review and approval of the declarant. No "cabinet signs" will be permitted, with the exception of the multi tenant signs. No signs painted directly on the building will be permitted.

6. All exterior signs, bolts, fastenings and clips shall be, stainless steel, aluminum, brass or bronze. No black iron or other rust prone materials of any type will be permitted.

7. All on-building signs shall be mounted directly onto or into the building surface. No "raceways" or other visible means of attachment may be used. Letters or logos may not be located closer than one third of the sign height to any building edge or architectural feature. Graphics crossing over horizontal reveals is discouraged.

8. Conduit Openings
Sign drawings submitted to and approved in writing by the declarant shall indicate location of all openings for conduits in the walls of the building.

9. Sealing of Openings
All penetrations of the building structure required for sign installation shall have approval in writing from the declarant and shall be neatly sealed in a watertight condition.

 Falcon
Business
Park

10. Labels
A "U.L." label must be placed on every separate electrical sign element (eg: every sign graphic or channel letter). A March JPA permit label must be placed on at least one sign element of each sign. All required labels must be placed in a conspicuous location. No other labels are allowed.

11. Exposed lamps or tubing will not be permitted.

12. Repair of Damage
The tenant is responsible for assuring that the sign contractor repairs (in a good and workman like manner) any damage caused by the contractor's work within two (2) days after such damage is caused.

13. Responsibility for Work
The tenant shall be fully responsible for the work of its sign contractors.

14. Cost of Electricity
Electrical service to all signs shall be on the tenant's meters and shall be part of the tenant's operational costs.

**D. Miscellaneous Restrictions**

1. Animated, flashing or audible signs will not be permitted.

2. Projections above or below the designated sign area will not be permitted.



Falcon
Business
Park

Page 5

0048

NOTES:

- 12" THICK CAST IN PLACE CONCRETE SIGN PANEL (FINISH TBD)
- GRAPHICS TO BE 1" DEEP CAST INTO SIGN PANEL WITH BACK SURFACE PAINTED TO MATCH (TBD)
- CROWN DETAIL TO BE CONCRETE & PAINTED TO MATCH (COLOR TBD)
- CROWN STYLE TO MATCH BLDGS. D & E ON-SITE
- SIGN MAY BE UP-LIT WITH GROUND MOUNTED WARM WHITE FLOOD LIGHTING.
  LIGHTING TO BE DESIGNED SO AS TO NOT CAUSE GLARE TO MOTORISTS.



**Project Identification Monument** - Elevation View

Page 6

Falcon
Business
Park

43

0049

44

**SIGN TYPE B:  Large Tenant ID**

These signs are provided for on-building business identification.  This sign type shall occur at the spandrel panel as shown in elevation, but not within 10' of a building address.  The copy shall be limited to company name in project or corporate letter style.  Wording of signs shall not include the product sold or services offered, except as a part of Tenant's trade name or insignia.  Only one sign will be permitted per tenant, per building (except for Two Story/Multi-Tenant Office Building at the declarant's discretion).

The maximum area for this sign type is thirty (30) square feet. Individual letters and logos shall not exceed 24" in height or 15' in overall length for each tenant. Only one primary sign may occur at a building corner.  This sign type may be internally "halo" or face illuminated.  Graphics shall be fabricated from non-ferrous metals. Graphics shall be a minimum of 1" thick per 6' graphic height.  Colors of graphics will be subject to the approval of the declarant or its Designee.  The exterior pan channel must be black.



North Elevation - Building A

Page 7



0050



24" X 15'-0"

TYPICAL SIGN PLACEMENT

SIGN TYPE B:  Large Tenant ID

These signs are provided for on-building business identification  This sign type shall occur at the spandrel panel as shown in elevation, but not within 10" of a building address.  The copy shall be limited to company name in project or corporate letter style.  Wording of signs shall not include the product sold or services offered, except as a part of Tenant's trade name or insignia.  Only one sign will be permitted per tenant, per building (except for Two Story/Multi-Tenant Office Building at the declarant's discretion).

The maximum area for this sign type is thirty (30) square feet. Individual letters and logos shall not exceed 24" in height or 15' in overall length for each tenant. Only one primary sign may occur at a building corner. This sign type may be internally "halo" or face illuminated.  Graphics shall be fabricated from non-ferrous metals.  Graphics shall be a minimum of 1" thick per 6" graphic height.  Colors of graphics will be subject to the approval of the declarant or its Designee.  The exterior pan channel must be black.

45



West Elevation - Buildings B & C



Page 8

Falcon
Business
Park

0051



**TYPICAL SIGN PLACEMENT**

SIGN TYPE B: Large Tenant ID

These signs are provided for on-building business identification. This sign type shall occur at the spandrel panel as shown in elevation, but not within 10' of a building address. The copy shall be limited to company name in project or corporate letter style. Wording of signs shall not include the product sold or services offered, except as a part of Tenant's trade name or insignia. Only one sign will be permitted per tenant, per building (except for Two Story/Multi-Tenant Office Building at the declarant's discretion).

The maximum area for this sign type is thirty (30) square feet. Individual letters and logos shall not exceed 24" in height or 15' in overall length for each tenant. Only one primary sign may occur at a building corner. This sign type may be internally "halo" or face illuminated. Graphics shall be fabricated from non-ferrous metals. Graphics shall be a minimum of 1" thick per 6" graphic height. Colors of graphics will be subject to the approval of the declarant or its Designee. The exterior pan channel must be black.

46



**East Elevation - Buildings F & G**



Page 9

47

24"X 15'-0"



TYPICAL SIGN PLACEMENT

**SIGN TYPE B:  Large Tenant ID**

These signs are provided for on-building business identification.  This sign type shall occur at the spandrel panel as shown in elevation, but not within 10' of a building address.  The copy shall be limited to company name in project or corporate letter style.  Wording of signs shall not include the product sold or services offered, except as a part of Tenant's trade name or insignia.  Only one sign will be permitted per tenant, per building (except for Two Story/Multi-Tenant Office Building at the declarant's discretion).

The maximum area for this sign type is thirty (30) square feet. Individual letters and logos shall not exceed 24" in height or 15' in overall length for each tenant. Only one primary sign may occur at a building corner.  This sign type may be internally "halo" or face illuminated.  Graphics shall be fabricated from non-ferrous metals. Graphics shall be a minimum of 1" thick per 6" graphic height.  Colors of graphics will be subject to the approval of the declarant or its Designee.  The exterior pan channel must be black.



East Elevation - Building H



Page 10

Falcon
Business
Park

# Tenant Name

ENLARGED SIGN DETAIL

**SIGN TYPE C:** Multi Tenant On-Building I.D.

These signs are provided for multi tenant on-building business identification. This sign type shall occur at the spandrel panel as shown in elevation, but not within 10' of a building address. This sign type is subject to 18" of free space to the left and right of the sign. The text shall be limited to company name in project type style or corporate letter style. Use of logos is discouraged, but may be approved subject to review by the Declarant or its Designee. Wording of signs shall not include the product sold or services offered, except as a part of tenant's trade name or insignia. Only one sign will be permitted per tenant.

The maximum area for this sign type is eighteen (18) square feet. Individual letters and logos shall not exceed 18" in height or 12' in overall length for each tenant. Can signs may not exceed a maximum of six (6) square feet. This sign type shall be non-illuminated. Graphics shall be fabricated from non-ferrous metals. Graphics shall be a minimum of 1" thick per 6" graphic height. Colors of graphics will be subject to the approval of the Declarant or its Designee. The exterior pan channel must be black.



North Elevation - Bldg. E

North Elevation - Bldg. D

48

Falcon
Business
Park

Page 11

0054

**EXHIBIT 'F'**
Industrial Waste Survey

# INDUSTRIAL WASTE SURVEY

**A. GENERAL INFORMATION**

1. Name of Business:  P & P Uniforms

   Mailing Address:  30733 Temecula Pkwy          Phone:  951 491-6090

   Temecula, Ca  92592

   Site Address:  14529 Innovation Drive

   Riverside, Ca  92518

   Lot & Build. #  Suite B

   Build. Sq. ft.  13,289

2. Name and Title of Contact Person:  Sean Shanabarger
                                      COO

3. Are there discharges to the sanitary sewer other than domestic wastewater (bathroom and kitchen

   waste?)          ☐ YES          ☐ NO

**B. PRODUCTS, SERVICES, WASTEWATER INFORMATION**

1. Major products manufactured or services provided at this location:
   Uniform Alterations

2. Number of employees at this location:          Hours:

   Full Time:  6
   Part Time:  3
   Shifts worked per day:  1

3. Work or Production Schedule at this location:
   Monday - Friday  8am - 5pm

   (Business hours, if commercial establishment)

   4. What is the Standard Industrial Classification (SIC) Code(s) for the business at this
   location (if known)?

5. Types of waste discharged to the sanitary sewer system. Check all that apply:

   X          Sanitary waste from bathrooms
   _____   Cleanup waste from floor drains
   _____   Kitchen Waste
   _____   Wastewater from manufacturing process(es)
   _____   Wastewater from laundry equipment or car wash
   _____   Wastewater from dry cleaning equipment
   _____   Wastewater from paint booth(s)
   _____   Wastewater from parts cleaning or preparation
   _____   Cooling water discharge
   _____   Other (describe)

6. Water use at this location:
   _____ thousands of gallons per month or  _____ hundreds of cubic feet per month (from utility
   bill) or _____ gallons per day.

49

7. Are there wastewater pretreatment systems installed at this location? ☐ YES ☒ NO
(Examples: Grease interceptor, Oil/sand separator, Neutralization, pH correction,
Reverse osmosis, Ion exchange etc.)
If yes, please describe type of treatment(s) and capacity of treatment system.

_____
_____
_____
_____
_____

## C. CHEMICAL STORAGE

1. Are bulk chemicals received and stored for use in this business? ☐ YES    ☒ NO

If yes, please list chemicals used or stored and approximate quantity that will be kept    on hand.
_____
_____
_____

(use additional pages if necessary)

2. What methods are in place to prevent toxic and/or hazardous chemicals from entering  the sanitary sewer system?

N/A
_____
_____
_____

3. Is there a spill containment and control plan in use at this location?

☐ YES        ☒ NO

Please describe how spilled chemicals would be contained and disposed of.

N/A
_____
_____
_____

## D. COMMENTS

_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____

I certify under penalty of law that I have personally examined and am familiar with the information in this application form and all attachments and that, based on my inquiry of those persons immediately responsible for obtaining the information contained in the application, I believe that the information is true, accurate and complete. I am aware that there are significant penalties for submitting false information, including the possibility of fine and/or imprisonment.

Paul Shanabarger
NAME – Authorized Representative                    SIGNATURE

CEO                                                10/29/13
OFFICIAL TITLE                                     DATE

50

### EXHIBIT "1"

To Addendum to Industrial Service–Center Lease

Annual Minimum Monthly Rent Increase:

(a)    As used herein, the following terms shall have the following meanings:

(i)    "Index" shall mean the Consumer Price Index for the Los Angeles-Anaheim-Riverside Metropolitan Area for all Urban Consumers-All Items, published monthly by the Bureau of Labor Statistics of the United States Department of Labor (1982-1984=100).   In the event the Index shall hereafter be converted to a different standard reference base or otherwise revised, such conversion factor, formula or table for converting the Index as may be published by the Bureau of Labor Statistics shall be used, or if the Bureau of Labor Statistics shall not publish the same, then such conversion factor, formula or table selected by Landlord as may be published by any other nationally recognized publisher of similar statistical information shall be used.   In the event the Index shall cease to be published, then there shall be substituted for the Index such other index of similar nature as is then generally recognized and accepted for like determinations of purchasing power, as Landlord shall select.

(ii) "Base Index" shall mean the Index in effect for the month that is three months prior to the Adjustment Date.

(iii)    "Adjustment Date" shall be each anniversary of the Commencement Date of the Extended Term and Option Period.  .

(iv)    "Adjustment Index" shall mean, as to each Adjustment Date, the Index in effect three months prior to the month in which Adjustment Date occurs.  If the Index shall cease to be published monthly, or there is no Index in effect for such month, the Adjustment Index shall be the most currently available quotation of the Index published prior to the relevant Adjustment Date.

(b)    The Minimum Monthly Rent shall be adjusted as of each Adjustment Date to be the greater of (i) the Minimum Monthly Rent in effect immediately prior to such Adjustment Date, increased three percent (3%), and (ii) the Minimum Monthly Rent in effect immediately prior to such Adjustment Date, increased by a fraction, the numerator of which shall be the Adjustment Index for such Adjustment Date and the denominator of which shall be the Base Index.  Landlord shall, as promptly as practicable after the publication of the Adjustment Index, give notice to Tenant of the Adjustment Index and the resulting adjustment in the Minimum Monthly Rent.  If Landlord's notice is not given prior to the Adjustment Date, until receipt of Landlord's notice, Tenant shall pay, as interim Minimum Monthly Rent, the Minimum Monthly Rent in effect immediately prior to the Adjustment Date.  Commencing with the next ensuing calendar month following Landlord's notice and until Landlord's notice with respect to the next succeeding Adjustment Date is given, Tenant shall pay the Minimum Monthly Rent indicated in Landlord's notice.  If at the time of Landlord's notice the total amount of interim Minimum Monthly Rent actually paid by Tenant following the Adjustment Date is less than the amount of Minimum Monthly Rent required to be paid for such period as indicated in Landlord's notice, Tenant shall immediately pay to Landlord the amount of the deficiency. Landlord's delay in giving notice of an adjustment in Minimum Monthly Rent shall not constitute a waiver of Landlord's right to receive such adjusted Minimum Monthly Rent for all periods from and after the applicable Adjustment Date.  Notwithstanding anything to the contrary above, the minimum increase shall be 3% and the maximum annual increase shall be seven percent (7%).

## ADDENDUM TO INDUSTRIAL-SERVICE CENTER LEASE

This Addendum to Industrial-Service Center Lease ("Addendum") entered into by and between **FALCON BUSINESS PARK LLC**, a California limited liability company ("Landlord"), and **P&P HARDWARE, INC., a California corporation** ("Tenant") is added to and made part of that certain Industrial-Service Center Lease dated October 25, 2013 by and between Landlord and Tenant ("Lease") relating to that certain property commonly referred to as 14529 Innovation Drive, Suite B, Riverside, California as follows:

1. **Option to Extend.** Tenant shall have the one-time right to extend the lease for the period set forth in the Basic Lease Information, subject to the conditions and limitations in Section 2.4 of the Lease. During the Extended Term, the Monthly Rent shall be increased on each anniversary of the Commencement Date by an amount equal to the increase in the Consumer Price Index as set forth on Exhibit "I" to this Addendum.

2. **Early Termination Option.** Tenant shall have the one-time right to terminate the lease at any time after month thirty-six (36) of the Lease Term. To invoke Tenant's right to terminate, Tenant must notify Landlord in writing and shall pay Landlord an early termination fee ("Termination Fee") equal to the sum of unamortized leasing commission and unamortized Landlord's Tenant Improvement costs, and such termination shall become effective six (6) months after the date of receipt of the notice and Termination Fee. For the purposes of this provision, Landlord's Tenant's Improvement costs at lease inception shall be deemed to be $36,795. If the Tenant shall exercise its right to extend the term of the lease as set forth in Section 1, above, this right to terminate shall become null and void and of no effect.

3. **Early Access.** Tenant shall have early access on December 1, 2013, at no additional cost to Tenant (upon lease execution, delivery of monies due and delivery of a certificate of insurance in accordance with Article 23 of the Lease), for the construction of Tenant's Improvements and fixturization of the Premises. Tenant shall not cause any interference with construction of Landlord's Improvements during the early access period.

**LANDLORD**

FALCON BUSINESS PARK LLC
a California limited liability company
By: Falcon BP II LLC
Its: Sole Member
By: _____
Donald E. Russell
Its:    Managing Member

**TENANT**

P&P HARDWARE, INC.
a California corporation

By: _____
Paul Douglas Shanabarger
Its: _____ CEO _____

## FIRST AMENDMENT TO INDUSTRIAL-SERVICE CENTER LEASE

This First Amendment to Industrial-Service Center Lease ("First Amendment") dated November 28, 2018,  entered into by and between **FALCON BP II LLC, a California limited liability company**, as per assignment of the lease by Falcon Business Park LLC, ("Landlord"), and **P&P HARDWARE, INC., a California corporation** ("Tenant") is added to and made part of that certain Industrial-Service Center Lease dated October 25, 2013 by and between Landlord and Tenant ("Lease") relating to that certain property commonly referred to as 14529 Innovation Drive, Suite B, Riverside, California as follows:

1. **Term.** The Term of this Lease is hereby extended beyond the current term expiring December 31, 2018 for an addition period of five (5) years, from January 1, 2019 through December 31, 2023, ("Extended Term").

2. **Monthly Rent.** Effective January 1, 2019, Monthly Rent shall be $9,966.75.

3. **Monthly Rent Increases.**   On January 1, 2020, and each subsequent anniversary date ("Adjustment Date"), Monthly Rent shall be adjusted annually by C.P.I. as detailed in the attached Exhibit "1" to this First Amendment.

4. **Early Termination Option.** Section 2 of the Addendum to Industrial-Service Center Lease shall be deleted and removed in its entirety.

5. **Option to Extend.** Section 1 of the Addendum to Industrial-Service Center Lease shall be deleted and removed in its entirety; Tenant shall have no right to extend the Lease.

All other terms and conditions contained in the Lease, or any prior addenda and amendments, shall not be modified except expressly by this First Amendment.


**LANDLORD:**                                         **TENANT:**

FALCON BP II LLC                                      P&P HARDWARE, INC.
a California limited liability company                a California corporation

By: _____                          By: _____
     Donald E. Russell                                    Paul Douglas Shanabarger
Its:  Managing Member                                 Its:  Chief Operating Officer

## EXHIBIT "1"

### To First Amendment to Industrial-Service Center Lease

Annual Minimum Monthly Rent Increase:

(a)     As used herein, the following terms shall have the following meanings:

(i)   "Index" shall mean the Consumer Price Index for the Los Angeles-Anaheim-Riverside Metropolitan Area for all Urban Consumers-All Items, published monthly by the Bureau of Labor Statistics of the United States Department of Labor (1982-1984=100). In the event the Index shall hereafter be converted to a different standard reference base or otherwise revised, such conversion factor, formula or table for converting the Index as may be published by the Bureau of Labor Statistics shall be used, or if the Bureau of Labor Statistics shall not publish the same, then such conversion factor, formula or table selected by Landlord as may be published by any other nationally recognized publisher of similar statistical information shall be used. In the event the Index shall cease to be published, then there shall be substituted for the Index such other index of similar nature as is then generally recognized and accepted for like determinations of purchasing power, as Landlord shall select.

(ii) "Base Index" shall mean the Index in effect for the month that is three months prior to the Adjustment Date.

(iii)     "Adjustment Date" shall be each anniversary of the Commencement Date of the Extended Term and Option Period. .

(iv)     "Adjustment Index" shall mean, as to each Adjustment Date, the Index in effect three months prior to the month in which Adjustment Date occurs. If the Index shall cease to be published monthly, or there is no Index in effect for such month, the Adjustment Index shall be the most currently available quotation of the Index published prior to the relevant Adjustment Date.

(b)     The Minimum Monthly Rent shall be adjusted as of each Adjustment Date to be the greater of (i) the Minimum Monthly Rent in effect immediately prior to such Adjustment Date, increased three percent (3%), and (ii) the Minimum Monthly Rent in effect immediately prior to such Adjustment Date, increased by a fraction, the numerator of which shall be the Adjustment Index for such Adjustment Date and the denominator of which shall be the Base Index. Landlord shall, as promptly as practicable after the publication of the Adjustment Index, give notice to Tenant of the Adjustment Index and the resulting adjustment in the Minimum Monthly Rent. If Landlord's notice is not given prior to the Adjustment Date, until receipt of Landlord's notice, Tenant shall pay, as interim Minimum Monthly Rent, the Minimum Monthly Rent in effect immediately prior to the Adjustment Date. Commencing with the next ensuing calendar month following Landlord's notice and until Landlord's notice with respect to the next succeeding Adjustment Date is given, Tenant shall pay the Minimum Monthly Rent indicated in Landlord's notice. If at the time of Landlord's notice the total amount of interim Minimum Monthly Rent actually paid by Tenant following the Adjustment Date is less than the amount of Minimum Monthly Rent required to be paid for such period as indicated in Landlord's notice, Tenant shall immediately pay to Landlord the amount of the deficiency. Landlord's delay in giving notice of an adjustment in Minimum Monthly Rent shall not constitute a waiver of Landlord's right to receive such adjusted Minimum Monthly Rent for all periods from and after the applicable Adjustment Date. Notwithstanding anything to the contrary above, the minimum increase shall be 3% and the maximum annual increase shall be seven percent (7%).

# EXHIBIT B

2

## EXHIBIT B

P&P Hardware
Account Statement
Administrative Claim

| | Amount |
|---|---|
| April 2020 Rent | $10,284.56 |
| April 2020 Late Fee | 514.23 |
| May 2020 Rent | 10,284.56 |
| May 2020 Late Fee | 514.23 |
| June 2020 Rent | 10,284.56 |
| June 2020 Late Fee | 514.23 |
| July 1-17 2020 Rent | 5,639.92 |
| July 2020 Late Fee | 514.23 |
| Total | $38,550.52 |

1

# PROOF OF SERVICE OF DOCUMENT

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding. My business address is:  10100 Santa Monica Boulevard, 13th Floor, Los Angeles, California 90067.

A true and correct copy of the foregoing document entitled: ***NOTICE OF MOTION AND MOTION OF FALCON BP II, LLC TO COMPEL PAYMENT OF ADMINISTRATIVE CLAIMS PURSUANT TO CONFIRMED PLAN OF REORGANIZATION AND 11 U.S.C. §§ 503(A) & (B) AND 507(A); AND FOR OTHER RELIEF; DECLARATION OF CHRIS KWASIZUR IN SUPPORT THEREOF*** will be served or was served **(a)** on the judge in chambers in the form and manner required by LBR 5005-2(d); and **(b)** in the manner stated below:

**1.  TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING (NEF)**: Pursuant to controlling General Orders and LBR, the foregoing document will be served by the court via NEF and hyperlink to the document. On (*date*) August 4, 2020, I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the following persons are on the Electronic Mail Notice List to receive NEF transmission at the email addresses stated below:

☒    Service information continued on attached page

**2.  SERVED BY UNITED STATES MAIL**: On (*date*), I served the following persons and/or entities at the last known addresses in this bankruptcy case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States mail, first class, postage prepaid, and addressed as follows. Listing the judge here constitutes a declaration that mailing to the judge will be completed no later than 24 hours after the document is filed.

☐    Service information continued on attached page

**3.  SERVED BY PERSONAL DELIVERY, OVERNIGHT MAIL, FACSIMILE TRANSMISSION OR EMAIL** (state method for each person or entity served): Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on (*date*), I served the following persons and/or entities by personal delivery, overnight mail service, or (for those who consented in writing to such service method), by facsimile transmission and/or email as follows. Listing the judge here constitutes a declaration that personal delivery on, or overnight mail to, the judge will be completed no later than 24 hours after the document is filed.

Hon. Mark Houle
3420 12th St  Ctrm. 303
Riverside, CA 92501-3819

☐    Service information continued on attached page

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

| August 4, 2020 | Gini L. Downing | /s/ Gini L. Downing |
|---|---|---|
| *Date* | *Printed Name* | *Signature* |

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

**<u>TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING (NEF)</u>:**

- Abram Feuerstein    abram.s.feuerstein@usdoj.gov
- Everett L Green    everett.l.green@usdoj.gov
- Christine Levi    bankruptcy@ondeck.com
- Randall P Mroczynski    randym@cookseylaw.com
- Rejoy Nalkara    rejoy.nalkara@americaninfosource.com
- Anthony J Napolitano    anapolitano@buchalter.com, IFS_filing@buchalter.com;salarcon@buchalter.com
- Aleksandra Page    apage@ecf.inforuptcy.com
- Cameron C Ridley    Cameron.Ridley@usdoj.gov
- Robert B Rosenstein    robert@thetemeculalawfirm.com, sylvia@thetemeculalawfirm.com;leah@thetemeculalawfirm.com;luke@thetemeculalawfirm.com
- Cheryl A Skigin    ca.ecf@aislaw.com, caskigin@earthlink.net
- Edward A Treder    cdcaecf@bdfgroup.com
- United States Trustee (RS)    ustpregion16.rs.ecf@usdoj.gov
- Darlene C Vigil    cdcaecf@bdfgroup.com